**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:24-cv-2185

JOHN AND JANE DOE,

      Plaintiffs,

v.

PHILIP WEISER, in his official capacity
as Attorney General of the State of Colorado;
SUSANA CÓRDOVA, in her official capacity
as Commissioner of the Colorado Department
of Education; and SCHOOL DISTRICT 27J
a/k/a 27J SCHOOLS, in its official and
personal capacities,

      Defendants.

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ...............................................................................3

   I.    BACKGROUND ON GENDER DYSPHORIA AND ITS TREATMENT ...................3

       A.  Terminology................................................................................3

       B.  The Treatment of Gender Dysphoria in Minors...............................................3

       C.  Social Transitioning is a Form of Psychological Treatment ...........................................4

       D.  Parental Consent is Necessary When Schools Socially Transition Minors. ..........................................5

   II.   THE NAME CHANGE LAW AND PARENTAL SECRECY  POLICY.........................6

   III.  THE DISTRICT SOCIALLY TRANSITIONS A.D. AT SCHOOL ...............................7

ARGUMENT ....................................................................................................9

   I.    THE DOES ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS..............................10

       A.  The Name Change Law and Parental Exclusion Policy Infringe the Does' Right to the Care, Custody, and Control of Their Children. ..............................10

           1.   Parents have the right to consent when the government provides healthcare treatment to their children. ..................................10

           2.   Parents have the right to consent when the government makes important decisions in the lives of their children.....................................14

           3.   Parents have the right to maintain the integrity of their family. ............................15

       B.  The Law and Policy do not Satisfy any Standard of Review......................................17

           1.   Strict Scrutiny ......................................................................17

              a.  Children do not have the right to socially transition at school or to keep their social transition secret from their parents. ............................18

              b.  The prevention of child abuse is not narrowly tailored. ........................................20

           2.   Rational Basis Review ..............................................................21

i

C.   The Name Change Law and Parental Exclusion Policy Infringe the Does' Procedural Rights. ............................................................................22

II.   THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR THE DOES ............................................................................................................23

III.   NO BOND SHOULD BE REQUIRED ...........................................................25

CONCLUSION.........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aid for Women v. Foulston*,
    441 F.3d 1101 (10th Cir. 2006) ................................................................................ 19

*Alfonso v. Fernandez*,
    606 N.Y.S.2d 259 (N.Y. App. Div. 1993) .............................................................. 14

Arnold v. Bd. of Educ. of Escambia Cnty.,
    880 F.2d 305 (11th Cir. 1989) ........................................................................... 16, 17

*Arrendondo v. Locklear*,
    462 F.3d 1292 (10th Cir. 2006) ................................................................................ 10

*Bellotti v. Baird*,
    443 U.S. 622 (1979) .................................................................................................. 18

*Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*,
    562 F.3d 1067 (10th Cir. 2009) .................................................................................. 9

*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011) .................................................................................................. 18

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011) .................................................................................................. 10

*Browne v. City of Grand Junction*,
    27 F. Supp. 3d 1161 (D. Colo. 2014) ...................................................................... 25

*C.N. v. Ridgewood Bd. of Educ.*,
    430 F.3d 159 (3d Cir. 2005) .............................................................................. 14, 15

*Chamber of Com. of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) .................................................................................. 25

*Deanda v. Becerra*,
    96 F.4th 750 (5th Cir. 2024) .................................................................................... 24

*Dias v. City & Cnty. of Denver*,
    567 F.3d 1169 (10th Cir. 2009) ................................................................................ 21

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) .............................................................................................. 18

*Dubbs v. Head Start, Inc.*,
    336 F.3d 1194 (10th Cir. 2003) ................................................................................11

*Franz v. United States*,
    707 F.2d 582 (D.C. Cir. 1983)............................................................ 17

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ...................................................... 23, 25

*Gerson v. Logan River Acad.*,
    20 F.4th 1263 (10th Cir. 2021)........................................................... 14

*Gomes v. Wood*,
    451 F.3d 1122 (10th Cir. 2006) .................................................... 20, 23

*Goss v. Lopez*,
    419 U.S. 565 (1975)........................................................................... 22

*Griffin v. Strong*,
    983 F.2d 1544 (10th Cir.1993) .......................................................... 15

Gruenke v. Seip,
    225 F.3d 290 (3d Cir. 2000) ................................................... 15, 16, 17

*H.L. v. Matheson*,
    450 U.S. 398 (1981)..................................................................... 14, 19

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) .................................................... 23, 24

*Hodgson v. Minnesota*,
    497 U.S. 417 (1990)..................................................................... 10, 16

*J.B. v. Washington Cnty.*,
    127 F.3d 919 (10th Cir. 1997)........................................................... 22

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
    927 F.3d 396 (6th Cir. 2019)............................................................. 17

*Kitchen v. Herbert*,
    755 F.3d 1193 (10th Cir. 2014) ......................................................... 17

*Lamb v. Norwood*,
    899 F.3d 1159 (10th Cir. 2018) ......................................................... 12

*Lawrence v. Texas*,
    539 U.S. 558 (2003)........................................................................... 18

*Loving v. Virginia*,
    388 U.S. 1 (1967).............................................................................. 18

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021) ........................................................................... 15

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .............................................................................. 22

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) .............................................................................. 14

*Mirabelli v. Olson*,
    No. 3:23-cv-00768-BEN-WVG,
    2023 WL 5976992 (S.D. Cal. Sept. 14, 2023) ................................. 15, 19

*Mueller v. Auker*,
    576 F.3d 979 (9th Cir. 2009) ................................................................ 17

*Nunez by Nunez v. City of San Diego*,
    *114 F.3d 935 (9th Cir. 1997)* ......................................................... 14, 17

*Onyx Properties LLC v. Bd. of Cnty. Comm'ners of Elbert Cnty.*,
    838 F.3d 1039 (10th Cir. 2016) ............................................................ 22

*Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*,
    166 Pa. Cmwlth. 462 (1994) ................................................................. 24

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) .............................................................................. 14

*PJ ex rel. Jensen v. Wagner*,
    603 F.3d 1182 (10th Cir. 2010) ...................................................... 10, 13

*Porter v. Allbaugh*,
    No. 18-CV-0472-JED-FHM,
    2019 WL 2167415 (N.D. Okla. May 17, 2019) ................................... 12

*Reno v. Flores*,
    507 U.S. 292 (1993) .............................................................................. 17

*Rocky Mountain Gun Owners v. Polis*,
    685 F. Supp. 3d 1033 (D. Colo. 2023) ................................................ 25

*Roper v. Simmons*,
    543 U.S. 551 (2005) ..............................................................................11

*Stanley v. Illinois*,
    405 U.S. 645 (1972) .............................................................................. 20

*Stewart v. City of Oklahoma City*,
  47 F.4th 1125 (10th Cir. 2022) ................................................................... 19

*Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L*,
  135 F.3d 694 (10th Cir. 1998) ..................................................................... 15

*T.F. v. Kettle Moraine School Dist.*,
  No. 2021CV1650,
  2023 WL 6544917 (Wis. Cir. Oct. 03, 2023) .............................................. 13

*Thomas v. Kaven*,
  765 F.3d 1183 (10th Cir. 2014) .............................................................. 16, 17

*Troxel v. Granville*,
  530 U.S. 57 (2000) ............................................................ 10, 13, 14, 17, 20, 21

*United States v. Bear*,
  769 F.3d 1221 (10th Cir. 2014) ................................................................... 17

*United States v. Salerno*,
  481 U.S. 739 (1987) ..................................................................................... 22

*Vernonia Sch. Dist. 47J v. Acton*,
  515 U.S. 646 (1995) ..................................................................................... 18

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ..................................................................................... 17

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*,
  680 F. Supp. 3d 1250 (D. Wyo. 2023) ................................................... 17, 21

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ..................................................................................... 14

**Statutes**

Colo. Rev. Stat. Ann. § 13-81-101 ................................................................... 18

Colo. Rev. Stat. Ann. § 14-15-106(1)(a) .......................................................... 18

Colo. Rev. Stat. Ann. § 18-3-402 ..................................................................... 18

Colo. Rev. Stat. Ann. § 19-3-304 ..................................................................... 21

Colo. Rev. Stat. Ann. § 19-3-401 ..................................................................... 21

Colo. Rev. Stat. Ann. § 22-1-145(a)(2) ............................................................ 22

Colo. Rev. Stat. Ann. § 25-4-210 ....................................................................... 2

Colo. Rev. Stat. Ann. § 26-5-111 ................................................................... 21

**Other**

Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health Care Organizations
*Adams v. The School Board of St. Johns County*,
Case No. 18-13592 ..................................................................................... 13

COMMENTARIES ON AMERICAN LAW,
J. Kent .......................................................................................................... 10

COMMENTARIES,
W. Blackstone ............................................................................................... 10

LGBTQ+ Toolkit ................................................................ 7, 18, 19, 22, 23

*Nondiscrimination in Health Programs and Activities*,
Proposed Rule, 87 FR 47,824-01 (August 4, 2022) .................................. 13

*The Cass Review*: *Independent review of gender identity services for children and young people*,
Dr. Hilary Cass, United Kingdom National Health Service (April 10, 2024) ........................ 12

*The myth of persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*,
Zucker, Ken J., 19 International Journal of Transgenderism .................................................. 12

## INTRODUCTION

The law of parent and child reflects one enduring principle: the best way to protect children from harm is to give their parents broad authority over them. Left to their own devices, children are immature and make rash decisions, while parents are presumed to be fit and to act in their children's best interests. Parents' decisions are not always correct, of course, but the government must defer to those decisions in the absence of a narrowly tailored, compelling reason not to.

Rather than trust parents, Colorado has given children decision-making authority on matters of grave importance. Under Colorado House Bill 24-1039 (the "Name Change Law" or the "Law"), public schools must refer to schoolchildren—who could be as young as five years old—by a name they chose as an expression of their asserted transgender identity. The Name Change Law does not require either parental consent or notice. Moreover, many school districts in Colorado, including School District 27J a/k/a 27J Schools (the "District"), have adopted policies (the "Parental Exclusion Policy" or the "Policy") requiring schools to call students by the name and pronouns of their choice, also without mandating parental consent or notice.

Calling children by a name and pronouns associated with their transgender identity is called "social transitioning," and it is a form of mental healthcare treatment in youth. Indeed, its very purpose is to alleviate the psychological distress that can accompany a transgender identity. But it is no mere benign act. Instead, it can change gender outcomes, making it more likely that a child's transgender identity persists into adulthood when it otherwise would not. And considering most children who undergo a social transition go on to transition medically—through puberty blockers, cross-sex hormones, and surgeries—this is not a choice children can make alone.

This case arises out of the District's social transition of John and Jane Doe's oldest daughter, A.D. When A.D. was a freshman in high school, a school counselor facilitated her social transition to a male gender identity at school without obtaining the Does' consent or notifying

them. While the Does were kept in the dark, A.D.'s mental health deteriorated. After two years of being socially transitioned at school, A.D. recently stopped feeling as if she were a boy. But her gender journey is not complete. She has yet to de-transition at school, and she is subject to pressures at school to maintain her transgender identity.

The Name Change Law and Parental Exclusion Policy infringe the Does' parental rights in four ways. First, schools that socially transition children upon their request violate their parents' right to consent to healthcare treatment the government provides their children. Second, schools that socially transition children upon their request violate their parents' right to consent when the government makes important decisions in their children's lives. Third, schools that socially transition children upon their request unduly interfere with their parents' right to family integrity. And fourth, the Law and Policy fail to provide parents the most basic procedural safeguards—notice and an opportunity to be heard—before socially transitioning their children.

Because the parental right is fundamental, strict scrutiny applies, but the Name Change Law and Parental Exclusion Policy fail any level of review. Children do not have a right to keep their parents from knowing they are being socially transitioned at school, and the government has no interest in protecting children from their parents in the absence of evidence the parents are abusive, which is totally lacking here. Moreover, Colorado already has a statutory mechanism assigning the authority to deal with abusive parents to a designated state agency under procedures that protect parents' due process rights. Schools are neither equipped nor capable of handling such situations on their own.

In Colorado, minors may not get a tattoo of their new name and pronouns without parental consent, *see* Colo. Rev. Stat. Ann. § 25-4-210, but they may adopt that new name and pronouns at school without parental consent or even notice.  That is irrational, and these practices must end.

**FACTUAL BACKGROUND**

I.      **BACKGROUND ON GENDER DYSPHORIA AND ITS TREATMENT**

    A.      **Terminology**

A person's "sex" refers to their biological reproductive capabilities. Declaration of Dr. Erica E. Anderson ¶ 9, attached hereto as Exhibit A.[1] A person's sex is immutable. *Id.* "Gender" refers to the characteristics of males and females that are socially constructed. *Id.* A person's "gender identity" is the person's felt experience of their gender. *Id.* Persons with a "transgender" identity feel their gender identity does not match their sex. *Id.* While it is not known exactly why some people come to have a transgender identity, broad agreement exists that it is the result of a complex interplay between biological, psychological, and social factors. *Id.* ¶ 29. Especially in minors, a person's gender identity can be fluid as the child develops. *Id.* ¶¶ 29, 52.

"Gender dysphoria" is a psychiatric condition in which the mismatch in a person's gender identity and sex causes clinically significant psychological distress. *Id.* ¶ 11. Many transgender-identifying minors have gender dysphoria or sub-threshold psychological distress. *Id.* ¶¶ 11, 33. Many also have other developmental and psychiatric conditions such as autism, depression, anxiety, and attention deficit / hyperactivity disorder. *Id.* ¶¶ 11, 32, 34.

    B.      **The Treatment of Gender Dysphoria in Minors**

There are four general approaches to treating gender dysphoria in minors. *Id.* ¶ 12. Under the "hands off" model, the mental health professional allows the minor's gender identity to evolve naturally with no ongoing treatment. *Id.* Under the "watchful waiting" model, the mental health professional allows the minor's gender identity to evolve while treating any other co-morbidities

---

[1] The facts set forth in this section are based on the Declaration of Dr. Erica Anderson. Dr. Anderson, a transgender female, is a clinical psychologist in the field of gender-divergent youth. *See* Anderson Decl. ¶¶ 1–3.

without a focus on gender. *Id.* Under the "psychotherapy" model, the mental health professional

seeks to identify and address the causes of the minor's distress through psychotherapy. *Id.*

The "affirmation" model is starkly different from the other three. *Id.* ¶ 13. It holds a minor's

expression of a transgender identity should be accepted as decisive and the minor's psychological

condition will improve with "affirmation" of that identity. *Id.*

**C.      Social Transitioning is a Form of Psychological Treatment**

A primary pillar of the "affirmation" model is social transitioning. *Id.* Social transitioning

refers to the active affirmation of a person's transgender identity. *Id.* In the school setting, it

primarily refers to calling students by a new name and/or pronouns associated with their

transgender identity. *Id.* ¶ 10. Social transitioning is a form of psychological treatment. *Id.* ¶¶ 10,

39. Its purpose is to alleviate psychological distress caused by the mismatch between a person's

gender identity and sex, regardless of whether the distress is clinically significant. *Id.* ¶ 10.

Social transitioning in minors is not a mere harmless exploration of the minor's gender

identity. *Id.* ¶ 45. Absent social transitioning, a large majority of transgender-identifying minors—

approximately 75-95% depending on the study—will desist by adulthood; that is, lose their

transgender identity. *Id.* ¶¶ 27, 36. But when social transitioning occurs, the rate of desistence

plummets. *Id.* ¶ 37. Thus, social transitioning in minors makes it more likely their transgender

identity will persist due to the psychological effect of inhabiting that identity. *Id.* ¶¶ 36–49.

Persistence in children who otherwise would have desisted is psychologically harmful. *Id.* ¶ 90.

Moreover, in the vast majority of cases minors who are socially transitioned go on to

receive graduated "affirmative" care in the form of puberty blockers and cross-sex hormones, and,

for some, "affirming" surgeries, like mastectomies and genital removal. *Id.* ¶¶ 60–62. Before social

transitioning is considered, the risks associated with this graduated "affirmative" care must be

considered. *Id.* ¶ 62. These risks are significant, and include bone weakness, cardiovascular harm, depression, decreased sexual response, sterility, and increased risk of suicide. *Id.*

Socially transitioning every minor who asks for it is a "one-size-fits-all" treatment approach that fails to account for the unique issues the minor may be facing. *Id.* ¶ 52–53, 67. Instead of social transitioning, some minors simply need counseling to understand the source of their feelings. *Id.* ¶¶ 26, 29, 53, 80. And from a treatment standpoint, it is permissible for parents to say "no" to social transitioning. *Id.* ¶¶ 67, 81. This particularly true considering there is no clear evidence social transitioning produces positive mental health outcomes in young children and there is only weak evidence of positive outcomes in adolescents. *Id.* ¶ 52.

### D.    Parental Consent is Necessary When Schools Socially Transition Minors.

Parental involvement is necessary when minors are socially transitioned. *Id.* ¶ 79–81. Before social transitioning is undertaken, every minor should receive a careful professional evaluation. *Id.* ¶¶ 8.a, 31–34. Schools that socially transition minors without their parents' consent necessarily interfere with the parents' ability to pursue an evaluation and take a more cautious approach before allowing the minor to make significant changes to his or her identity. *Id.* ¶ 79. By socially transitioning minors in secret from their parents, schools are making decisions regarding the minor's healthcare treatment—treatment that can have serious, life-long consequences—that the minor's parents should make with assistance from a mental health professional. *Id.* ¶ 79–81.

Schools that socially transition minors in secret from their parents also harm students' well-being. *Id.* ¶ 50. Doing so keeps minors who may be experiencing psychological distress from receiving adequate treatment from a qualified mental health professional. *Id.* ¶¶ 35, 70–80. Doing so necessarily results in the ill-advised social transitioning of some percentage of minors, leading to increased persistence and the serious consequences that follow. *Id.* ¶ 67. Doing so is inherently

psychologically unhealthy because it causes minors to secretly inhabit different gender identities at home and school. *Id.* ¶ 83. And doing so increases minors' sense that their parents are "the enemy," driving a wedge in the family and precluding parental acceptance just when it is needed most. *Id.* ¶¶ 82, 85. Indeed, no medical or psychological association has endorsed school-facilitated social transitions of minors without parental consent. *Id.* ¶ 86.

## II.     THE NAME CHANGE LAW AND PARENTAL SECRECY  POLICY

Under the Name Change Law, all schools in the state—including those in the District—must refer to students by any name they chose that "reflect[s their] gender identity." Colo. Rev. Stat. Ann. § 22-1-145(a)(2). The Law does not require parental consent or notice. *Id.*

The District is based in Brighton. Compl. ¶ 19. It operates 33 schools—from kindergarten to high school—and has a total enrollment of approximately 23,000 students. *Id.* The District has several policies comprising its Parental Exclusion Policy, which governs student social transitions. Compl. ¶¶ 66–75. Under the Policy, if a child asks to go by a new name and/or pronouns associated with their transgender identity, a school counselor will "schedule a meeting with the [child] . . . to ascertain their desires and concerns." LGBTQ+ Toolkit at 5, 8, attached to Complaint as Exhibit E. Based on that meeting, the counselor will create a "Gender Support/Communication Plan," a document setting forth information to aid in the child's social transition, including whether the child's parents are aware of the transition and how to refer to the child in communications with their parents. *Id.* at 6, 13; *see also* Gender Support Plan Questions, attached to Complaint as Exhibit F. The Policy requires all District personnel and other students to honor the child's wishes as to how he or she is referred to, including calling the child by his or her new name and pronouns. LGBTQ+ Toolkit at 5 at 15–16; *see also* Name Changes Policy: ACA (noting discrimination includes "deliberately misusing an individual's preferred name . . . or gender-related pronouns").

Under the Policy, parental consent is not required. LGBTQ+ Toolkit at 5; *see also* Name Changes Policy: ACA, attached to Complaint as Exhibit D. Moreover, unless the child expressly consents to parental notification, the District will only inform the parents if District personnel find disclosure is appropriate after considering student's "health, well-being and safety." *Id.* at 6.[2] Absent such a finding, District personnel are prohibited from disclosing the social transition to the child's parents. LGBTQ+ Toolkit at 11. Instead, the Policy requires District personnel to conceal the transition from parents by "us[ing] the [child's] legal name and the pronoun corresponding to the student's [sex]" in communications with parents. *Id.* at 14. And in response to inquiries from parents regarding whether the school is socially transitioning their children, the Policy requires district personnel to refuse to tell the truth and even to lie to parents about the transition. *Id.*; *see also* Compl. ¶ 75.

## III.     THE DISTRICT SOCIALLY TRANSITIONS A.D. AT SCHOOL

The Does have two daughters, A.D and B.D., both of whom attend school in the District. Compl. ¶¶12-15.[3] The Does are "fit parents, . . . always seek to do what is best for [their children], . . . and involve themselves in their children's . . . activities at school . . . to ensure they are informed about their children's actions so they may better guide them through life." *Id.* ¶ 16.

A.D. has a history of transgender identification dating back to 2019, during her 6th grade year, when she began experiencing other mental health struggles. *Id.* ¶¶ 76–77. The Does arraigned

---

[2] The Policy has slightly different formulations governing parental notice for elementary and secondary schools.  *See* LGBTQ+ Toolkit at 5–6. Because the Does' children are in secondary schools, this Memorandum focuses on the Policy as it applies in secondary schools.

[3] The Does file this action under pseudonyms, and they have filed a separate motion to proceed pseudonymously and to use pseudonymous initials of their children to further protect their children's privacy. As set forth in that motion, the Does are willing to reveal their and their children's identities to Defendants under an appropriate protective order.

for A.D. to begin seeing a private counselor to help with those struggles. *Id.* ¶ 78. A.D. has seen a private counselor, off and on, since that time. *Id.* ¶ 79. When A.D. was in the 7th grade, she asked her parents if they would allow her to be socially transitioned. *Id.* ¶¶ 80–81. Based on the Does' conclusion that A.D.'s transgender identification was a product of her other mental health struggles and not a permanent gender identity, the Does said "no." *Id.* ¶ 82.

Early in A.D.'s freshman year in high school, she began seeing a school counselor (the "Counselor") on a regular basis regarding her mental health struggles. *Id.* ¶¶ 84–88. A.D. also informed the Counselor she had a transgender identification. *Id.* To help alleviate A.D.'s psychological distress, the Counselor encouraged A.D. to undergo social transitioning at school. *Id.* ¶ 89. A.D. began identifying as a boy at school, using a male name she had picked out— "Z.D."—and non-female pronouns. *Id.* ¶¶ 90–95. A.D. did not want her parents to know about the social transition, and, despite the fact A.D.'s mental health worsened after the transition, neither the Counselor nor anyone else at the school informed the Does. *Id.* ¶¶ 91, 96, 105. In fact, District personnel—including the Counselor—concealed A.D.'s social transition from the Does, referring to A.D. as "Z.D." and by non-female pronouns at school while referring to her as "A.D." and by female pronouns in conversations with the Does. *Id.* ¶¶ 93–94, 107, 112, 119.

In the spring of A.D.'s freshman year, the Does learned she was experiencing a transgender identity again. *Id.* ¶ 113. Ms. Doe spoke with the Counselor about the issue. *Id.* ¶ 115. The Counselor asked Ms. Doe if she wanted A.D. to be socially transitioned at school. *Id.* ¶ 117. Ms. Doe said she did not. *Id.* The Counselor did not inform Ms. Doe that A.D. had already been socially transitioned, and the school continued to treat A.D. as if she were a boy. *Id.* ¶¶ 118–19.

Over the next several months, the Does' relationship with A.D. deteriorated. *Id.* ¶ 124. She wanted to start testosterone and have a mastectomy, but they would not consent. *Id.* Instead, they wanted her to explore other treatment options prior to making irreversible decisions. *Id.* ¶ 125.

In March of 2024, A.D. informed her parents she no longer identified as a boy. *Id.* ¶ 126. A.D. now believes her underlying mental health struggles prompted her to adopt a transgender identity, and she is thankful that her parents did not allow her to undergo irreversible medical procedures. *Id.* ¶ 127–28. But A.D.'s gender journey is not complete. *Id.* ¶ 133. A.D. has not yet de-transitioned at school. *Id.* ¶ 134. In addition, A.D. is still dealing with the underlying mental-health challenges that she believes caused her to first identify as a boy. *Id.* ¶¶ 135–36. Moreover, the fact that A.D. was socially transitioned at school for two years makes it likely that her transgender identity will persist. *Id.* ¶ 137. And A.D. is subject to pressures at school to maintain—or revert to—her transgender identity. *Id.* ¶¶ 138–40.

## **ARGUMENT**

The Court should grant a preliminary injunction when the plaintiff demonstrates four equitable factors weigh in its favor: (1) it is "substantially likely to succeed on the merits"; (2) it will suffer "irreparable injury if the injunction is denied"; (3) its threatened injury in the absence of an injunction "outweighs the injury the opposing party will suffer under the injunction"; and (4) the injunction is not "adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

The Does make a strong showing on each of these factors. Thus, the Court should preliminarily enjoin the Name Change Law and Parental Exclusion Policy insofar as they authorize the District to socially transition the Does' children without parental consent.

## I.     THE DOES ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

### A.  The Name Change Law and Parental Exclusion Policy Infringe the Does' Right to the Care, Custody, and Control of Their Children.

Parents have a "fundamental right" protected by the substantive component of the Due Process Clause to direct the "care, custody, and control" of their minor children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.); *Arrendondo v. Locklear*, 462 F.3d 1292 (10th Cir. 2006). This right rests on the common-law presumptions of parental fitness and affection— *viz.*, that (1) "parents possess what a child lacks in maturity, experience, and capacity for judgment" and (2) the "natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (citing 1 W. Blackstone, COMMENTARIES * 447; 2 J. Kent, COMMENTARIES ON AMERICAN LAW * 190); *see also Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 822–23, 835 (2011) (noting "the founding generation believed parents had absolute authority over their minor children," a concept that "persisted in the decades leading up to the ratification of the Fourteenth Amendment") (Thomas, J., concurring); *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) ("Under the common law, parents had the right . . . to speak and act on their [children's] behalf.") (Kennedy, J., concurring in part and dissenting in part).

As set forth below, the Name Change Law and Parental Exclusion Policy interfere with the Does' parental rights in three ways.

1. <u>Parents have the right to consent when the government provides healthcare treatment to their children.</u>

Parents have the right to consent when the government provides healthcare treatment to their children. *See Parham*, 442 U.S. at 602 (acknowledging existence of such right); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (noting the constitution protects "parents' decisions regarding their children's medical care"); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203

(10th Cir. 2003) (noting parents' "right to control the upbringing, including the medical care, of a child"). As the Supreme Court has observed, "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Parham*, 442 U.S. at 602; *see also Roper v. Simmons*, 543 U.S. 551, 569 (2005) (noting children are "vulnerable . . . to negative influences and outside pressures, including peer pressure" and often make "impetuous and ill-considered . . . decisions"). And as the Tenth Circuit has noted, "[i]n medical procedures involving children, ensuring the existence of parental consent is critical, because children rely on parents or other surrogates to provide informed permission for medical procedures essential for their care." *Dubbs*, 336 F.3d at 1207.

Social transitioning is a form of healthcare treatment. Anderson Decl. ¶ 10. While it is unlike many other forms of healthcare treatment—like traditional forms of psychotherapy, pharmaceuticals, or an injection—it is treatment nonetheless:

- The purpose of social transitioning is to "alleviate the psychological distress" that can be "caused by the mismatch between one's natal sex and gender identity." *Id.*

- Social transitioning is a "primary pillar" of the affirmation model of treatment for transgender-identifying children, which seeks to treat gender dysphoria by affirming the child's transgender identity. *Id.* ¶ 13.

- Adherents of the affirmation model hold the view that the child's "psychological condition will improve with 'affirmation'" through social transition. *Id.*

- Like other forms of psychological treatment, a social transition is not without risks. For one thing, because of the "psychological difficulty" of de-transitioning, it decreases the odds of desistence. *Id.* ¶¶ 36–48. Moreover, it almost invariably leads to future "affirmative care" in the form of puberty blockers and cross-sex hormones, the risks of which are significant and can be irreversible. *Id.* ¶¶ 8.g, 61–62. Further, it is "inherently psychologically unhealthy" for the child to inhabit secret gender identities. *Id.* ¶ 82–83.

- Socially transitioning every child who asks to be socially transitioned is a "one-size-fits-all" treatment approach that fails to account for the broader and unique psychological issues each child is facing. *Id.* ¶ 53.

- No professional medical association "recommends that school officials facilitate the social transition of a child or adolescent without parental knowledge and consent." *Id.* ¶ 8.k.

Indeed, the Tenth Circuit has already concluded social transitioning constitutes a form of healthcare treatment. *Lamb v. Norwood*, 899 F.3d 1159, 1161 (10th Cir. 2018) (noting "[t]reatment forms [for gender dysphoria] currently include . . . [c]hanges in gender expression and role (which may involve living . . . in another gender role, consistent with one's gender identity)"); *see also Porter v. Allbaugh*, No. 18-CV-0472-JED-FHM, 2019 WL 2167415, at *2 n.3 (N.D. Okla. May 17, 2019) (noting "[c]urrent treatments for gender dysphoria include . . . social transition").

In addition to Dr. Anderson, other experts in the field view social transitioning as a form of healthcare treatment. In April of this year, Dr. Hilary Cass released the final version of her long-awaited evidence review assessing the safety and efficacy of practices associated with the "affirmational" method of care. *See The Cass Review: Independent review of gender identity services for children and young people*, Dr. Hilary Cass, United Kingdom National Health Service (April 10, 2024), attached to Complaint as Exhibit A. As Dr. Cass concluded, social transitioning is "an active intervention" in the life of minors "because it may have significant effects on the [minor] in terms of their psychological functioning and longer-term outcomes." *Id.* at 158; *see also id.* at 162 (noting "sex of rearing seems to have some influence on eventual gender outcome"). Dr. Ken Zucker, another leading clinician in the field, has opined that social transitioning is a form of "psychosocial treatment that will increase the odds of long-term persistence." Zucker, Ken J., *The myth of persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*, 19 International Journal of Transgenderism at 237, attached to Complaint as Exhibit B. Many leading medical associations—including but not limited to the American Medical Association, the

American Academy of Pediatrics, and the Endocrine Society—hold the view that one "treatment" for gender dysphoria "is to assist the patient to live in accordance with his or her gender identity, . . . . [through] . . . social transition." Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health Care Organizations in Support of Appellee *in Adams v. The School Board of St. Johns County*, Case No. 18-13592, at 17, attached to Complaint as Exhibit C. And the United States Department of Health and Human Services also views social transitioning as a form of treatment. *Nondiscrimination in Health Programs and Activities*, Proposed Rule, 87 FR 47,824-01, *47,867 (August 4, 2022) (observing social transitioning can be the "clinically indicated next step for [a gender non-conforming] child"). Because social transitioning is a form of healthcare treatment, schools must obtain parental consent before socially transitioning their children at school. *T.F. v. Kettle Moraine School Dist.*, No. 2021CV1650, 2023 WL 6544917, at *5 (Wis. Cir. Oct. 03, 2023) (holding socially transitioning child without parental consent "directly implicates an infringement against the parental . . . right to direct the care for their child").

To be sure, while the parental right "reside[s] first" in the parents, *Troxel*, 530 U.S. at 65 (plurality op.), the government may provide healthcare treatment to children without parental consent under its *parens patriae* authority "when a child's life [or health] is under immediate threat." *Jensen*, 603 F.3d at 1198. But social transitioning does not present such a situation. Neither the Name Change Law nor the Parental Exclusion Policy require schools to find the child's life or health is under "immediate threat" before socially transitioning them at school. Moreover, unlike an emergency situation, social transitioning is a slow, deliberative processes in which seeking parental consent is always feasible.

For these reasons, the Name Change Law and Parental Exclusion Policy violate the Does' parental right to consent when the government seeks to provide healthcare to their children.

2. <u>Parents have the right to consent when the government makes important decisions in the lives of their children.</u>

Even if social transitioning were not healthcare treatment (and it is), the Name Change Law and Parental Exclusion Policy violate the Does' right to consent when the government makes "important decisions" in their children's lives. *H.L. v. Matheson*, 450 U.S. 398, 411 (1981); *see also Gerson v. Logan River Acad.*, 20 F.4th 1263, 1280 (10th Cir. 2021) (noting "[p]arents can and must make many decisions on behalf of their children" (cleaned up)). Parents have the "primary role" in raising their children, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), and the Constitution protects those decisions that go to the "heart of parental decision-making," *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005). Among the decisions courts have held are protected include decisions regarding child visitation, *Troxel*, 530 U.S. 57, whether to send children to private school, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), the subjects children can be taught, *Meyer v. Nebraska*, 262 U.S. 390 (1923), whether children can go out in public at night, *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 952 (9th Cir. 1997), and whether children have access to birth control at school, *Alfonso v. Fernandez*, 606 N.Y.S.2d 259, 265–66 (N.Y. App. Div. 1993).

The decision whether to socially transition a child falls squarely within these precedents. Even if social transitioning were not healthcare treatment (and it is), changing a child's gender identification is an important decision in the life of the child. It is a decision that is likely to have both immediate impact and send reverberations throughout the child's life course. Moreover, when done by schools behind parents' backs—it results in the child being without the parental guidance they desperately need. Because of the consequential nature of this decision, parents' "have [the right to] have a say in what [their] minor child[ren are] called" by their school. *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 522CV04015HLTGEB, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022); *see also Mirabelli v. Olson*, No. 3:23-cv-00768-BEN-WVG, 2023 WL 5976992, at *9 (S.D.

Cal. Sept. 14, 2023) (concluding school district's "policy of elevating a child's gender-related choices to that of paramount importance, while excluding a parent from knowing of, or participating in, that kind of choice, is . . . foreign to federal constitutional . . . law").

Further, socially transitioning students at school without parental consent does not fall within the scope of schools' implied authority under the *in loco parentis* doctrine. Under that doctrine, schools have "inferred parental consent" that gives them "a degree of authority . . . commensurate with the task that the parents ask the school to perform"—namely, to educate their children. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2052 (2021) (Alito, J., concurring). Consistent with that authority, parents "do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998) (holding parental right does not include authority to send child to public school on a part-time basis). But socially transitioning students without parental consent is not within the scope of that inferred delegation—parents do not hand children off to schools so they may facilitate changing the child's gender identity.

In short, parents' rights do not stop at "the threshold to the schoolhouse door." *C.N.*, 430 F.3d at 185 n.6. "It is not educators, but parents who have primary rights in the upbringing of children," *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000), and parents cannot play this crucial role in the lives of their children if schools are facilitating children's social transition without obtaining parental consent.

### 3.   Parents have the right to maintain the integrity of their family.

The Name Change Law and Parental Exclusion Policy also infringe the Does' right to "family integrity." *Griffin v. Strong*, 983 F.2d 1544, 1549 n.6 (10th Cir.1993). This right is

protected by the substantive component of the Due Process Clause, *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) (plurality op.), and the First Amendment's concept of "intimate association," *Bd. of Dir. of Rotary Intern. v. Rotary Club*, 481 U.S. 537, 545 (1987). As the Tenth Circuit has held, this right protects parents against state action that constitutes an "unwarranted intrusion" in the parent-child relationship. *Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014).

Socially transitioning children without obtaining parental consent constitutes an "unwarranted intrusion" in parents' relationship with their children. Doing so fundamentally alters the "deep attachments" parents have with their children, *Rotary Club*, 481 U.S. at 545, and "deprives . . . parents the opportunity to counter influences on" their children with which they disagree. *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 312 (11th Cir. 1989). And by injecting itself into the Does' "family crisis," the government is impermissibly "obstruct[ing] the parental right to choose the proper method of resolution." *Gruenke*, 225 F.3d at 306.

*     *     *

To be clear, the Does do not assert the District must notify them if it has a suspicion—or even direct knowledge—their children are asserting a transgender identity (or, for that matter, *any* identity or orientation) at school. Rather, the Does assert only that the District may not take *affirmative steps* to socially transition their children—*i.e.*, by creating an environment at school where everyone is required to call their children by a new name and pronouns—without first obtaining parental consent. It is these *affirmative steps*—and not mere knowledge—that trigger the government's obligation to obtain the Does' consent.

In the alternative, even if the Does do not have the right to *consent* when the government socially transitions their children at school (and they do), they at least have the right to *notice*. *Hodgson*, 497 U.S. 483 (observing common-law right of parents to be "notified of their children's actions") (Kennedy, J., concurring in part and dissenting in part); *see also Mueller v. Auker*, 576

16

F.3d 979, 995, 997 (9th Cir. 2009) (holding parental notice is required when government provides healthcare treatment to children). Parents cannot direct the upbringing of their children "unless they are accurately informed" as to whether they are being socially transitioned at school. *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 680 F. Supp. 3d 1250, 1277 (D. Wyo. 2023). The Name Change Law and Parental Exclusion Policy fail even this modest command.

### B.  The Law and Policy do not Satisfy any Standard of Review.

#### 1.  <u>Strict Scrutiny</u>

The parental right is "fundamental." *Troxel*, 530 U.S. at 67 (plurality op.); *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). When the government interferes with a "fundamental" right, it must satisfy strict scrutiny. *Reno v. Flores*, 507 U.S. 292, 301–302 (1993). Thus, interference with the parental right is subject to strict scrutiny. *See United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. 2014) (noting restrictions on parental right must be justified by "compelling" reasons that are "especially fine-tuned" to achieve their purposes); *see also Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019); *Gruenke*, 225 F.3d at 307; *Arnold*, 880 F.2d at 313; *Nunez*, 114 F.3d at 952; *Franz v. United States*, 707 F.2d 582, 602–03 (D.C. Cir. 1983); *see also Troxel*, 530 U.S. at 80 (Thomas, J., concurring).[4]

To satisfy strict scrutiny, the government must show the infringement is "narrowly tailored to serve a compelling government interest." *Reno*, 507 U.S. at 302; *see also Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014). Here, the Does anticipate Defendants will attempt to justify

---

[4] Separate from *Bear*, the Tenth Circuit has a line of cases holding interference with the right to family integrity is measured according to a balancing test that examines the "severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action." *Thomas*, 765 F.3d at 1196 (cleaned up). This balancing test approximates strict scrutiny. And to the extent is it less stringent, for the same reasons as set forth in the text below, the balancing of these factors favors the Does.

the Name Change Law and Parental Exclusion Policy on the ground that circumventing parental consent (1) protects children's privacy and (2) prevents child abuse. *See* LGBTQ+ Toolkit at 14 (asserting students' right to "privacy"), 6 (asserting parental notice may "carr[y] risks for the student"). These justifications do not satisfy strict scrutiny.

> a. *Children do not have the right to socially transition at school or to keep their social transition secret from their parents.*

Even if the constitution protects *adults'* decisional right to pick the name and pronouns they are known by, that right would not extend to *minor children*. "[T]he constitutional rights of children cannot be equated with those of adults." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979) (plurality op.), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). Indeed, "unemancipated minors lack some of the most fundamental rights of self-determination." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, (1995). Adults, for example, have the constitutional right to marry, *Loving v. Virginia*, 388 U.S. 1, (1967), to engage in consensual sexual relations, *Lawrence v. Texas*, 539 U.S. 558 (2003), and to petition the government for grievances, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Yet almost every state in the union, including Colorado, has laws restricting children from engaging in these activities. *See, e.g.*, Colo. Rev. Stat. Ann. § 14-15-106(1)(a) (prohibiting minor from entering civil union); Colo. Rev. Stat. Ann. § 18-3-402 (restricting sexual intercourse with minor); Colo. Rev. Stat. Ann. § 13-81-101 (defining minors as "persons under disability" precluded from filing suit). And considering "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing," *Belotti* , 443 U.S. at 640 (plurality op.), the Court should be skeptical of arguments that seek to interpose the Constitution between parents and their children. This skepticism is especially warranted here, considering the

long-term "medical, emotional, and psychological consequences" of social transitioning, which leave children particularly vulnerable to their own immature decisions. *H.L.*, 450 U.S. at 411.

Moreover, children do not have the informational privacy right to keep their social transition secret from their parents. While the Tenth Circuit has held minors have informational privacy rights in limited situations, *Aid for Women v. Foulston*, 441 F.3d 1101, 1117 (10th Cir. 2006), it has never held minors have the right keep their *healthcare treatment secret from their parents*. Moreover, considering cases like *Parham*, *Dubbs*, and *Jensen*, which recognize parents have the right to consent when the government seeks to provide their children healthcare treatment, such an argument would fail out of the gate.

Further, informational privacy rights only exist when the claimant has a "legitimate expectation of privacy" in the information at issue. *Stewart v. City of Oklahoma City*, 47 F.4th 1125, 1137 (10th Cir. 2022). Children do not have a legitimate expectation of privacy regarding their social transition at school, which is open and obvious to everyone in the school environment. Indeed, the Parental Exclusion Policy requires *everyone* at school—administrators, teachers, and other students—to refer to students by their new name and pronouns upon the child's request. LGBTQ+ Toolkit at 15–16. Children have no reasonable expectation of privacy in information shared throughout the school environment. *Mirabelli*, 2023 WL 5976992, at *10 (concluding a student who "is referred to by teachers and students and others by [a] new name, gender, or pronoun, can hardly be said to have a reasonable expectation of privacy"). This conclusion is particularly true with respect to the Does, who "involve themselves in their children's activities—including but not limited to their activities at school—to ensure they are informed about their children's actions so they may better guide them through life." Compl. ¶ 16. Because children do

not have a privacy right to socially transition at school or to keep such a transition secret from their parents, privacy is not a compelling governmental interest.

### b. The prevention of child abuse is not narrowly tailored.

While the prevention of child abuse is assuredly a compelling interest in the abstract, Defendants cannot establish circumventing parental consent is narrowly tailored to that end. Under the constitutionally mandated presumptions of parental fitness and affection, the government must presume parents are fit and will act in their children's best interests. *Parham*, 442 U.S. at 603. Indeed, the Supreme Court has rejected the "statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect [their] children" as "repugnant to American tradition." *Id.* (emphasis in original); *see also Troxel*, 530 U.S. at 65 (noting authority over children "reside[s] first" with parents) (plurality op.); *Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (holding unconstitutional statute presuming unwed fathers were unfit).

The Law and Policy impermissibly flip these presumptions on their head.  As an initial matter, failing to socially transition a child does not, without more, constitute child abuse. As Dr. Anderson explains, "it can be appropriate for parents to say "no" to a social transition." Anderson Dec. ¶ 67. And while the government may intervene in the family and protect children from abusive parents, the government "has no interest . . . in protecting children from their parents unless it has some reasonable evidence that the parent is unfit and the child is in imminent danger." *Wallis v. Spencer*, 202 F.3d 1126, 1142 n.14 (9th Cir. 2000); *see also Gomes v. Wood*, 451 F.3d 1122, 1128 (10th Cir. 2006) (holding government may take custody of a child without providing pre-deprivation notice to parents only when it has "reasonable suspicion of any immediate threat to the safety of the child"); *Ricard*, 2022 WL 1471372, at *8 (concluding government may circumvent parental notice only "where there is a particularized and substantiated concern that

disclosure . . . could lead to . . . abuse"); *Willey*, 680 F. Supp. 3d at 1277 (concluding "where there is no reasonable concern for the minor child's safety there is no rational . . . reason" for parental secrecy).  Because the Law and Policy do not require any such "particularized or substantiated concern," they violate the presumptions of fitness and affection underlying the parental right. And because the Does are fit parents who love their children and will always seek to do what is best for them, Compl. ¶ 16, Defendants could not make such a showing here.

Further, if District personnel have reason to believe a child is in danger of being subjected to abuse from their parents, Colorado law provides a way to address that concern—they may report the parents under the Colorado Child Abuse and Neglect Hotline Reporting System. *See* Colo. Rev. Stat. Ann. § 26-5-111. Indeed, District personnel are mandated reporters of child abuse under Colorado law. *See* Colo. Rev. Stat. Ann. § 19-3-304. By making such a report, school personnel will involve the Colorado Department of Human Services (the "DHS"), the state agency empowered to take actions designed to protect children, including, if necessary, taking them into protective custody, while giving their parents the due process rights to which they are entitled. *See* Colo. Rev. Stat. Ann. § 19-3-401; *see also* Section I.B, *infra*. Schools may not, however, circumvent parental consent and notice based on speculative concerns of abuse.

## 2.  Rational Basis Review

The Name Change Law and Parental Exclusion Policy also fail rational basis review. Under rational basis review, a government policy must "bear a rational relationship to a legitimate government interest." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). As discussed, child privacy is not a legitimate government interest. And because the Law and Policy are predicated on the assumption that all parents could be child abusers, they are irrationally overbroad. *Troxel*, 530 U.S. at 65 (plurality op.); *Willey*, 680 F. Supp. 3d at 1277.

**C. The Name Change Law and Parental Exclusion Policy Infringe the Does' Procedural Rights.**

The Name Change Law and Parental Exclusion Policy also violate the Does' procedural due process rights. When socially transitioning children at school in secret from their parents, District personnel must make factual determinations that: (1) the child's chosen name "reflect[s his or her] gender identity," Colo. Rev. Stat. Ann. § 22-1-145(a)(2); Name Changes Policy: ACA; and (2) considerations regarding "the health, well-being, and safety" of the child favor secrecy, LGBTQ+ Toolkit at 6. Because these determinations involve case-by-case adjudications implicating parents' substantive rights—*i.e.*, the right to the care, custody, and control of their children—the procedural requirements of the Due Process Clause apply. *J.B. v. Washington Cnty.*, 127 F.3d 919, 925 (10th Cir. 1997) (concluding state action implicating parental right triggers procedural protections); *see also Onyx Properties LLC v. Bd. of Cnty. Comm'ners of Elbert Cnty.*, 838 F.3d 1039, 1046 (10th Cir. 2016) ("When the [government] action has a limited focus . . . and is based on grounds that are individually assessed, it may be more adjudicative than legislative and therefore subject to traditional procedural requirements . . . ."). This is true even if the Law and Policy satisfied substantive review. *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("When government action depriving a person of life, liberty, or property survives substantive . . . scrutiny, it must still be implemented in a fair manner.").

The Law and Policy do not provide parents the most basic requirements of procedural due process—"notice and opportunity [to be heard]," *Goss v. Lopez*, 419 U.S. 565, 579 (1975)—prior to (or even after) these determinations are made. Accordingly, the Law and Policy contain insufficient procedural protections to guard against the erroneous deprivation of parents' rights. *Mathews v. Eldridge*, 424 U.S. 319, 338 (1976) ("The essence of due process is the requirement that "a person . . . be given notice of the case against him and opportunity to meet it." (cleaned

up)); *see also Gomes*, 451 F.3d at 1128 (holding the government must always provide at least post-deprivation hearing when depriving parental rights). Thus, even if the Name Change Law and Parental Exclusion Policy survived substantive review, they nevertheless violate the procedural component of the Due Process Clause.

## II.   THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR THE DOES

Under Tenth Circuit precedent, "[a]ny deprivation of any constitutional right" constitutes irreparable harm sufficient to justify a preliminary injunction. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). Here, the Does have made a strong showing the Name Change Law and Parental Exclusion Policy violate their parental rights to the care, custody, and control of their children. Accordingly, their harm is irreparable.

In addition, the Does' injury is sufficiently imminent to warrant preliminary relief. To establish imminence, the plaintiff must show the injury is "not theoretical" and "there is a clear and present need for equitable relief." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (cleaned up). The Does have satisfied this standard.

First, once the 2024–25 school year begins, if the Does were to ask the District whether A.D. and B.D. were being socially transitioned at school, the District would be required, under the Parental Exclusion Policy, either to refuse to answer or to say "no," regardless of whether their children were being socially transitioned, assuming such a response was called for after considering "the health, well-being and safety" of A.D. and B.D. LGBTQ+ Toolkit at 14; Compl. ¶¶ 75, 150. The Does' inability to obtain accurate information—information to which they are entitled under the parental right—constitutes imminent harm. *Willey*, 680 F. Supp. 3d at 1288 (enjoining parental secrecy policy requiring school officials to lie in response to parents' question regarding whether their children were being socially transitioned at school).

Second, the very existence of the Name Change Law and Parental Exclusion Policy usurps the Does' fundamental parental rights. Simply by being on the books, these provisions (1) offer A.D. and B.D. a means by which to be socially transitioned at school in circumvention of the parental right, (2) sow seeds of doubt in A.D. and B.D.'s minds as to whether the Does are fit parents who are looking out for their best interests, and (3) require the Does to alter their relationships with A.D. and B.D., including but not limited to require them to speak with their children about gender-identity related issues that they otherwise would not discuss. Compl. ¶¶ 152–56. This also constitutes imminent harm. *Deanda v. Becerra*, 96 F.4th 750, 757 (5th Cir. 2024) (holding father had standing to obtain declaratory judgment that contraceptive distribution program "over[rode his] parental rights" despite no allegation his children sought to obtain contraceptives); *Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 166 Pa. Cmwlth. 462, 466 (1994) (holding same with respect to school's condom distribution program).

Third, while A.D. currently identifies as a girl, there is a realistic danger she will come to identify as a boy again and seek to be socially transitioned at the beginning of the 2024–25 school year (August 9, 2024). Compl. ¶ 134. The following facts support this conclusion: (1) A.D. only recently began identifying as a girl again after almost five years of having feelings of a transgender identification; (2) children, like A.D., who have been socially transitioned are highly likely to persist in their transgender identity due to the psychological difficulty in de-transitioning; (3) A.D. has not yet de-transitioned at school, and she will face peer and other outside pressures to remain identified as a boy when school resumes; and (4) A.D., like other children her age, are highly susceptible to peer and other outside pressures such as those A.D. will experience when school resumes. *Id.* ¶¶ 135–141. On these facts, the Does have demonstrated a "clear and present need for equitable relief." *Heideman*, 348 F.3d at 1189.

The same is true for A.D.'s younger sister, B.D. While B.D. currently identifies as a girl, the District is introducing the concept of transgender identities to her at too young of an age to comprehend, there are peer and other outside pressures at the District to socially transition, and the environment to which B.D. is exposed at her middle school makes it likely that she will come to have a transgender identity and seek to be socially transitioned at school, like her sister did. *Id.* ¶¶ 142–48.

As for the other preliminary injunction factors, they also tilt in the Does' favor. The government "has no interest in keeping an unconstitutional law on the books." *Free the Nipple*, 916 F.3d at 806; *see also Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (concluding a state "does not have an interest in enforcing a law that is likely constitutionally infirm"). And it is "always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple*, 916 F.3d at 807 (cleaned up); *see also Edmondson*, 594 F.3d at 771. Because the Does have demonstrated they are likely to succeed on the merits and that they will suffer irreparable harm in the absence of a preliminary injunction, the balance of harm tips in their favor and the injunction is in the public interest.

## III.    NO BOND SHOULD BE REQUIRED

Finally, the Court should not require a bond because the Does seek to enforce their constitutional rights against the government and the injunction will not require Defendants to incur any monetary costs. *Rocky Mountain Gun Owners v. Polis*, 685 F. Supp. 3d 1033, 1061 (D. Colo. 2023); *Browne v. City of Grand Junction*, 27 F. Supp. 3d 1161, 1168 (D. Colo. 2014).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Does' motion for preliminary injunction.

Respectfully submitted,

Dated: August 7, 2024.

by:

*/s/Scott Gessler*
Scott Gessler
Gessler Blue Law
7350 E. Progress Place
Suite 100
Greenwood Village, CO 80111
(720) 839-6637
sgessler@gesslerblue.com

Harmeet K. Dhillon*
Josh W. Dixon*
Eric A. Sell*
Center for American Liberty
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6212
harmeet@libertycenter.org
jdixon@libertycenter.org
esell@libertycenter.org

Attorneys for Plaintiffs John and Jane Doe
*Application for Admission Forthcoming