**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:24-cv-02185-CNS-SBP

JOHN AND JANE DOE,

     Plaintiffs,

v.

PHILIP WEISER, in his official capacity as Attorney General of the State of Colorado;
SUSANA CÓRDOVA, in her official capacity as Commissioner of the Colorado
Department of Education; and
SCHOOL DISTRICT 27J a/k/a 27J SCHOOLS, in its official and personal capacities,

     Defendants.

---

**FIRST AMENDED VERIFIED COMPLAINT[1]**

---

**INTRODUCTION**

1.     States across the country are grappling with a mental-health crisis among youth. This crisis has created acute challenges for school officials, who are often on the front lines of this epidemic. One particularly vulnerable class of young people are those struggling with their gender identity. Sadly, the state of Colorado and public schools across the state have erected barriers between these children and their parents—the very people who love and support them—leading to more isolation and harm. And the government has violated parents' constitutional rights in the process.

---

[1] The Does file this First Amended Complaint of right under Federal Rule of Civil Procedure 15(a)(1)(B).

1

FIRST AMENDED VERIFIED COMPLAINT

2.      Colorado's Name Change Law requires all public schools to use a child's "preferred name" to aid in the child's social transition to their preferred gender identity. The Law does not have a lower age limit; thus, it applies to children as young as five years old. Under the Law, parental consent is not necessary for a school to begin referring to a child by a new name associated with their transgender identity, and schools are not required to disclose the name change to the child's parents. Moreover, many school districts—like School District 27J here—have adopted Parental Exclusion Policies that prohibit schools from disclosing this information to parents in most instances based on nothing more than their children's say-so. As a result, public schools in the state are socially transitioning children to a different gender identity through the use of children's preferred names and/or pronouns at school while their parents are kept in the dark.

3.      Social transitioning is a powerful form of psychological treatment. While activists, advocacy groups, and even Defendants try to downplay the significance of social transitioning as a harmless recognition of a child's identity, the reality is that gender identity in children can be fluid and influenced by outside pressures, and social transitioning has the possibility of causing a child's transgender identity to persist when the child would otherwise lose that identity before adulthood. For this reason, social transitioning in minors may only be done under the watchful supervision of a trained mental-health professional and with close parental involvement at every step of the way.

4.      Plaintiffs John and Jane Doe have two daughters—A.D. and B.D.—in schools operated by School District 27J. A.D., their oldest daughter, has a history of mental-health struggles and uncertainty regarding her sexual orientation. When A.D. was a fourteen-year-old freshman in high school, she asked a school counselor to help her

FIRST AMENDED VERIFIED COMPLAINT

socially transition to a male name—"Z.D."—at school. Following school policy, the counselor assisted A.D. with the transition, but neither the counselor nor anyone else at the school told the Does. Instead, the school concealed the transition from the Does, referring to A.D. as "A.D." in conversations and communications with the Does while referring to A.D. as "Z.D." at school. In addition, the counselor assisted A.D. to connect with a therapist through Colorado's I Matter program—a telemedicine portal created by the state of Colorado to facilitate mental-health treatment for young people—again without telling the Does. The counselor even arranged for A.D. to access her I Matter therapy sessions on the counselor's own computer so A.D. parents would not discover her social transition.

5.     In the spring of A.D.'s freshman year, the Does came to suspect that A.D.'s school had socially transitioned her in secret from them. But by then, A.D.'s trust of her parents had deteriorated due to the school's actions. The Does are loving and supportive parents, and they wanted their daughter to explore the root of her distress through therapy rather than view transitioning as a panacea that would solve all her problems. But because A.D. was convinced that transitioning was the only answer, her parents' alternative approach appeared unsupportive. While the Does informed the counselor they did not want A.D. to be socially transitioned, the school nevertheless continued to treat A.D. as if she were a boy.

6.     The next year was a difficult one in the Doe household. A.D. wanted to undergo a medical transition by taking testosterone injections and undergoing a mastectomy, but the Does would not allow her to be subjected to these procedures. Initially, A.D. was adamant that the only way she could be happy was through a medical

3

FIRST AMENDED VERIFIED COMPLAINT

transition. Over the last approximately six months, however, A.D. has slowly come to believe that she does not have a transgender identity. While A.D. still has ongoing struggles with her gender identity that will likely last into adulthood, she now believes her identification as a boy was a subconscious attempt to mask her other mental-health struggles and make sense of her sexual orientation. Recognizing that trying to change who she is was not the answer, A.D. is on the path to a happier and healthier life.

7.      Though A.D. is on the road to recovery, her gender journey is not complete. Indeed, the very fact that she was socially transitioned at school for two years makes it likely that she will experience a transgender identity again. And A.D., like other children at her school, is subject to peer and other outside pressures to maintain her transgender identity. While A.D. has now told her current teachers that she would like to be known as "A.D" and to use female pronouns again, she has not told all her former teachers, and she is faced with the daunting task remaining resolute in the de-transition.

8.      Defendants have harmed the Does' relationship with A.D., are currently harming the Does, and will continue to harm the Does unless the Court enjoins them from socially transitioning children at school without parental consent or, at the very least, notice. The Does bring this action to vindicate their rights and protect all Colorado children from Defendants' dangerous actions.

**<u>JURISDICTION AND VENUE</u>**

9.      The Does seek relief under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(3).

4

FIRST AMENDED VERIFIED COMPLAINT

10.     This Court has personal jurisdiction over Defendants. Defendants are the Attorney General of the State of Colorado (in his official capacity), the Commissioner of the Colorado Department of Education (in her official capacity), and a Colorado school district. The acts at issue in this lawsuit all occurred and will occur in Colorado.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred and will occur in this District.

## PARTIES

12.     Plaintiff Jane Doe[2] is a resident of Colorado who lives within the boundaries of School District 27J a/k/a 27J Schools (the "District").

13.     Plaintiff John Doe is Jane Doe's husband. He is a resident of Colorado who lives with Jane Doe within the boundaries of the District.

14.     The Does have legal custody of their minor children, A.D. (age 16) and B.D. (age 13). A.D and B.D. attend schools in the District.

15.     It would present a financial hardship for the Does to remove their children from public school and either homeschool them or send them to private school.

16.     The Does are advocates of public education, and they both have public educators in their families. The Does consider themselves "liberal" on the political spectrum. John Doe has been a registered Democrat for almost twenty years, and Jane Doe had been a registered Democrat for almost twenty years until the events alleged herein. Today, she is unaffiliated.

---

[2] The Court has authorized the Does to proceed under pseudonyms and to use pseudonymous initials of their children to protect their privacy. ECF 40, 41.

5

FIRST AMENDED VERIFIED COMPLAINT

17.    The Does are both fit parents, love their children dearly, always seek to do what is best for them, would never harm them, and involve themselves in their children's activities—including but not limited to their activities at school—to ensure they are informed about their children's actions so they may better guide them through life.

18.    Defendant Philip Weiser is the Attorney General of the State of Colorado. The Attorney General has primary enforcement authority of Colorado law, and he has the specific statutory authority to bring an enforcement action against "any government authority" for violating state law. Colo Rev. Stat. § 24-31-113. Thus, the Attorney General has the authority to enforce the Name Change Law by filing an enforcement action against school districts who do not comply with its provisions. In addition, the Attorney General has the authority, "at the request of the governor, secretary of state, state treasurer, . . . or commissioner of education," to "prosecute . . . all suits relating to matters connected with their departments." Colo. Rev. Stat. Ann. § 24-31-101(h). A suit against a non-compliant school employee or school district would be "connected with" the Colorado Department of Education.

19.    The Attorney General has joined amicus briefs in other cases around the country touting the purported importance of school policies that require schools to socially transition students upon their request. *See, e.g.*, Br. of Amici Curiae States in Support of Appellee in *Regino v. Staley*, No. 23-16031 (9th Cir. 2023), attached hereto as Exhibit A; *see also* Br. of Amici Curiae States in Support of Defendants in *Carroll Independent School District v. DOE*, No. 4:24-cv-00461-O (N.D. Tex. 2024), attached hereto as Exhibit B. In addition, the Attorney General has instituted lawsuits against third parties based on perceived harm to youth and directed funds garnered from those lawsuits toward school

FIRST AMENDED VERIFIED COMPLAINT

policies he supports. *See, e.g.*, Tom Hesse, *Colorado's Attorney General wants fewer phones in class and his office is willing to pay for it*, CPR News, Sept. 20, 2024, attached hereto as Exhibit C and available online at https://www.cpr.org/2024/09/20/colorado-attorney-general-grant-program-school-districts-phone-policies/# (last visited Oct. 22, 2024); *see also* Phil Weiser, *Prepared Remarks: Addressing Our Youth Mental Health Crisis*, at the Colorado Education Initiatives Hopeful Futures Conference (June 4, 2024), attached hereto as Exhibit D and available online at https://coag.gov/blog-post/weiser-youth-mental-health-remarks-6-4-24/?utm_campaign=MOVE&utm_medium=email (lasted visisted Oct. 22, 204). Based on the Attorney General's continued advocacy for parental exclusion policies, his history of bringing suit against those he perceives as harming youth, and his willingness to use available funds to advance his vision for Colorado schools, he has demonstrated a willingness to exercise his authority to enforce the Name Change Law.

20.     In performing his role, the Attorney General acts within the scope of his employment and under color of state law for purposes of 42 U.S.C. § 1983.

21.     Defendant Susana Córdova is Commissioner of the Colorado Department of Education. The Commissioner of the Colorado Department of Education directs the activities of the Colorado Department of Education, which implements education laws and policies enacted by the State Board of Education, the Colorado General Assembly, and federal law. In performing that role, she acts within the scope of her employment and under color of state law for purposes of 42 U.S.C. § 1983.

22.     Defendant School District 27J a/k/a 27J Schools is a public school district under Colorado law. The District is based in Brighton, Colorado. It operates approximately

FIRST AMENDED VERIFIED COMPLAINT

33 schools, with a total enrollment—from kindergarten to high school—of approximately 23,000 students. At all relevant times, the District was—and will be—acting under color of state law for purposes of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

### BACKGROUND ON GENDER DYSPHORIA AND ITS TREATMENT

23.    The facts in this section on the background of gender dysphoria and its treatment are based on the Declaration of Dr. Erica E. Anderson, dated August 2, 2024, which is attached as Exhibit A to the Does' Memorandum in Support of their Motion for Preliminary Injunction. *See* ECF 2-2. These facts are also generally supported by the following sources: (1) *The Cass Review*: *Independent review of gender identity services for children and young people*, Dr. Hilary Cass, United Kingdom National Health Service (April 10, 2024), attached hereto as Exhibit E; (2) Zucker, Ken J., *The myth of persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*, 19 International Journal of Transgenderism at 237 (2018), attached hereto as Exhibit F; and (3) Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health Care Organizations in Support of Appellee *in Adams v. The School Board of St. Johns County*, Case No. 18-13592 (11th Cir. 2022), at 17, attached hereto as Exhibit G.

**Terminology**

24.    A person's "sex" refers to their biological reproductive capabilities.

25.    A person's sex is immutable.

26.    "Gender" refers to the characteristics of males and females that are socially constructed.

8

FIRST AMENDED VERIFIED COMPLAINT

27.    A person's "gender identity" is the person's felt experience of their gender.

28.    Persons with a "transgender" identity feel their gender identity does not match their sex.

29.    While it is not known exactly why some people come to have a transgender identity, broad agreement exists that it is the result of a complex interplay between biological, psychological, and social factors.

30.    Especially in minors, a person's gender identity is mutable.

31.    "Gender dysphoria" is a psychiatric condition in which the mismatch in a person's gender identity and sex causes clinically significant psychological distress.

32.    Many transgender-identifying minors have gender dysphoria or sub-threshold psychological distress.

33.    Many transgender-identifying minors also have other developmental and psychiatric conditions such as autism, depression, anxiety, and attention deficit / hyperactivity disorder.

**The Treatment of Gender Dysphoria in Children**

34.    There are four general approaches to treating gender dysphoria in minors—the "hands off" model, the "watchful waiting" model, the "psychotherapy" model, and the "affirmation" model.

35.    Under the "hands off" model, the mental health professional allows the minor's gender identity to evolve naturally with no ongoing treatment.

36.    Under the "watchful waiting" model, the mental health professional allows the minor's gender identity to evolve while treating any other co-morbidities without a focus on gender.

9

FIRST AMENDED VERIFIED COMPLAINT

37.    Under the "psychotherapy" model, the mental health professional seeks to identify and address the causes of the minor's distress through psychotherapy.

38.    The "affirmation" model is starkly different from the other three.

39.    The "affirmation" model holds that a minor's expression of a transgender identity should be accepted as decisive and that the minor's psychological condition will improve with "affirmation" of that identity.

**Social Transitioning is a Form of Psychological Treatment**

40.    A primary pillar of the "affirmation" model of treatment is social transitioning.

41.    Social transitioning refers to the active affirmation of a person's transgender identity.

42.    In the school setting, social transitioning primarily refers to calling students by a new name and/or pronouns associated with their transgender identity.

43.    Social transitioning through the creation of an environment in which a child's transgender identity is affirmed is a form of psychological treatment. This is true regardless of the subjective intent of those creating the environment, similar to the way in which giving a child medication constitutes treatment regardless of the subjective intent of the individual providing the medication.

44.    The purpose of social transitioning is to alleviate psychological distress caused by the mismatch between a person's gender identity and sex, regardless of whether that distress is clinically significant. The very fact that a child is asking to be socially transitioned indicates some measure of psychological discomfort associated with being identified as the gender associated with the child's natal sex.

10

FIRST AMENDED VERIFIED COMPLAINT

45.    Social transitioning in minors is not a mere harmless exploration of the minor's gender identity.

46.    Absent social transitioning, a large majority of transgender-identifying minors—in the range of approximately 75-95%, depending on the study—will desist by adulthood; that is, they will lose their transgender identity. A larger percentage of transgender-identifying children grow up to be same-sex attracted than do children who do not identify as transgender.

47.    When social transitioning is introduced, however, the rate of desistence plummets to approximately 5%, again depending on the study.

48.    Social transitioning in minors makes it more likely that their transgender identity will persist into adulthood due to the psychological effect of inhabiting that identity.

49.    Persistence in children who otherwise would have desisted is harmful to them psychologically.

50.    In the vast majority of cases, minors who are socially transitioned go on to receive graduated "affirmative" care in the form of puberty blockers and cross-sex hormones, and, for some, "affirming" surgeries, like mastectomies, genital removal surgery, vaginoplasties, and phalloplasties.

51.    Before social transitioning is considered, the risks associated with this graduated "affirmative" care must be considered.

52.    These risks are significant, and include bone weakness, cardiovascular harm, depression, decreased sexual response, sterility, and increased risk of suicide.

53.    Socially transitioning every minor who asks for it is a "one-size-fits-all" treatment approach that fails to account for the unique issues the minor may be facing.

FIRST AMENDED VERIFIED COMPLAINT

54.    Instead of social transitioning, some minors simply need counseling to understand the source of their feelings.

55.    From a treatment standpoint, it can be permissible for parents to say "no" to social transitioning.

56.    This particularly true considering there is no clear evidence that social transitioning produces positive mental health outcomes in young children and there is only weak evidence of positive outcomes in adolescents.

**Parental Involvement is Necessary for the Treatment of Children.**

57.    Parental involvement is necessary when minors are socially transitioned.

58.    Before social transitioning is undertaken, every minor should receive a careful professional evaluation.

59.    Schools that socially transition minors without their parents' consent necessarily interfere with the parents' ability to pursue an evaluation and take a more cautious approach before allowing the minor to make significant changes to his or her identity.

60.    By socially transitioning minors in secret from their parents, schools are making decisions regarding the minor's healthcare treatment—treatment that can have serious, life-long consequences—that the minor's parents should be making with assistance from a mental health professional.

61.    Schools that socially transition minors in secret from their parents also harm students' well-being.

12

FIRST AMENDED VERIFIED COMPLAINT

62.     Socially transitioning minors in secret from their parents keeps minors who may be experiencing psychological distress from receiving adequate treatment from a qualified mental health professional.

63.     Socially transitioning minors in secret from their parents necessarily results in the ill-advised social transitioning of some percentage of minors, leading to increased persistence and the serious consequences that follow.

64.     Socially transitioning minors in secret from their parents is inherently psychologically unhealthy because it causes minors to secretly inhabit different gender identities at home and school.

65.     Socially transitioning minors in secret from their parents increases minors' sense that their parents are "the enemy," driving a wedge in the family and precluding parental acceptance just when it is needed most.

66.     No medical or psychological association has endorsed school-facilitated social transitions of minors without parental consent.

### HOUSE BILL 24-1039 (THE NAME CHANGE LAW)

67.     House Bill 24-1039 (the "Name Change Law" or the "Law") became effective on April 29, 2024. *See* Colo. Rev. Stat. Ann. § 22-1-145, *et seq.* Among other things, the Name Change Law requires employees of public schools in the state to refer to students by any name they chose that "differs from the student's legal name, to reflect the student's gender identity." Colo. Rev. Stat. Ann. § 22-1-145(1)(a), (2). In addition, the Law requires school districts to "implement a written policy outlining how [they] will honor a students' request to use a chosen name." Colo. Rev. Stat. Ann. § 22-1-145(5).

13

FIRST AMENDED VERIFIED COMPLAINT

68.     The Law also provides that students and employees of public schools engage in discrimination by the "knowing or intentional use of a name other than a student's chosen name." Colo. Rev. Stat. Ann. § 22-1-143(1)(d)(IV). In addition, the Law requires school districts to "adopt a written policy that protects students experiencing harassment or discrimination," Colo. Rev. Stat. Ann. § 22-1-143(3)(a), and to provide regular training to its "employees about harassment and discrimination," Colo. Rev. Stat. Ann. § 22-1-143(4).

69.     Under the Name Change Law, parents do not have the right to consent to—or to notice of—their child's name change at school. Rather, under the Law, children's name may be changed at school without parental consent and without parents being notified.

70.     The Law applies to all public schoolchildren in the state, regardless of age. *Id.* Thus, it applies to children as young as five years old.

## THE PARENTAL EXCLUSION POLICY

71.     Since at least February 2021, before the passage of the Name Change Law, the District has had several policies—collectively referred to as the "Parental Exclusion Policy" or the "Policy"—that govern student social transitions. In February 2021, the Parental Exclusion Policy was set forth in a document entitled the "LGBTQ+ Toolkit." *See* 2021 LGBTQ+ Toolkit, attached hereto as Exhibit H.

72.     After the effective date of the Name Change Law (April 29, 2024) and before the Does filed this suit (August 7, 2024), the District amended the Parental Exclusion Policy. The amendments were minor and are not material to this litigation.

14

FIRST AMENDED VERIFIED COMPLAINT

73.    Under the current version of the Parental Secrecy Policy, which is set forth in several different polices, including the Name Changes Policy: ACA, the 2024 LGBTQ+ Toolkit, and the Bullying Prevention and Education Policy: JICDE, if a child asks to go by a new name and/or pronouns that "reflect[s his or her] gender identity," a school counselor will meet "with the [child] . . . to ascertain [his or her] desires and concerns." Name Changes Policy: ACA, attached hereto as Exhibit I; 2024 LGBTQ+ Toolkit at 6 ("When a student elects to transition during the school year, the school should schedule a meeting with the student and parents/guardians **(provided they are involved in the process)**, to ascertain their desires and concerns." (emphasis in original)), attached hereto as Exhibit J.

74.    Neither parental consent nor notice are required for a child to go by a new name and pronouns at school. Name Changes Policy: ACA ("Students . . . do not need parental approval."); *see also* 2024 LGBTQ+ Toolkit at 6 (observing that parents may excluded from the process in certain situations).

75.    Based on the child's wishes as expressed at the meeting, the counselor will create a "Gender Support/Communication Plan," a document that sets forth information to aid in the child's social transition at school. 2024 LGBTQ+ Toolkit at 7, 8, 13.

76.    The information in the Gender Support/Communication Plan includes information like whether the child's parents are aware of the transition, how to refer to the child in communications with their parents, whether the child wants to use bathrooms and other facilities associated with the child's new gender identity, *etc.* 2024 LGBTQ+ Toolkit at 13; *see also* Gender Support Plan Questions, attached hereto as Exhibit K.

15

FIRST AMENDED VERIFIED COMPLAINT

77.     The Parental Exclusion Policy requires all District personnel and other students to honor the child's wishes as to how he or she is to be referred to, including calling the child by his or her new name and pronouns. 2024 LGBTQ+ Toolkit at 6, 16; *see also* Name Changes Policy: ACA (noting that discrimination includes "deliberately misusing an individual's preferred name . . . or gender-related pronouns"); Bullying Prevention and Education Policy: JICDE (forbidding "[g]ender identity harassment"), attached hereto as Exhibit L.

78.     Under the text of the Parental Exclusion Policy, for elementary school students, unless the child consents to parental notification of the social transition, the District will only inform his or her parents if District personnel find the social transition is "creating difficulty for the child at school." 2024 LGBTQ+ Toolkit at 6.

79.     Under the text of the Parental Exclusion Policy, for secondary school students, unless the child consents to parental notification of the social transition, the District will only inform his or her parents if District personnel find such disclosure is appropriate after considering "the health, well-being and safety of the student." 2024 LGBTQ+ Toolkit at 6–7.

80.     Despite the text of the Policy, the District has candidly admitted that it interprets the Parental Exclusion Policy to require parental secrecy whenever the child simply tells school personnel that their parents are "not supportive" of the transition. *See* District Opp'n to Pls.' Mot. for Prelim. Injunc. (ECF 25) at 6 n.3; *see also id.* at 24.

81.     Unless the child authorizes otherwise, District personnel are prohibited from disclosing the social transition to the child's parents. 2024 LGBTQ+ Toolkit at 11 ("Do not out students to anyone. Coming out to family . . . should be decided upon by the student.").

16

FIRST AMENDED VERIFIED COMPLAINT

82.    Unless the child authorizes otherwise, District personnel are required to conceal the transition from parents by "us[ing] the [child's] legal name and the pronoun corresponding to the student's [sex]" in communications with his or her parents. 2024 LGBTQ+ Toolkit at 14.

83.    Unless the child authorizes otherwise, if parents of a child who is being transitioned ask the District whether their child is being transitioned, the Policy requires District personnel to refuse to tell the truth or to lie to parents about the transition. 2024 LGBTQ+ Toolkit at 14; *see also* A.D.'s Gender Support Plan, filed under seal as Exhibit G to the District's Opposition to Plaintiffs' Motion for Preliminary Injunction at 3 (providing that District personnel should answer questions from the Does regarding whether A.D. is being socially transitioned by stating "We're following the legal practice with your student[.]").

**THE DISTRICT SOCIALLY TRANSITIONS A.D. AT SCHOOL**

84.    A.D. attended middle school (6th through 8th grades) at a school operated by the District. During the 2019–20 school year, A.D. was in the 6th grade.

85.    Early in her 6th grade year, A.D. began feeling socially withdrawn, depressed, and anxious. She also started experiencing feelings of transgender identification.

86.    The Does arraigned for A.D. to begin seeing a private counselor to help with her mental-health struggles.

87.    A.D. has seen a private counselor, off and on, since that time. Over the years, A.D. has been treated for various psychological conditions, including but not limited

FIRST AMENDED VERIFIED COMPLAINT

to depressive disorder, attention-deficit hyperactivity disorder, mood disorder, adjustment disorder, and gender identity disorder (under the ICD-10).

88.     Prior to A.D.'s 8th grade year, she asked her parents if they would allow her to be socially transitioned and start identifying as a boy.

89.     Based on the Does' conclusion that A.D.'s transgender identification was a product of her other mental health struggles and not a permanent gender identity, the Does said "no."

90.     During the 2021–22 school year, A.D. was in the 8th grade.

91.     The District has a computerized student database, which is called Infinite Campus. Among other things, students' names and pronouns are listed in Infinite Campus.

92.     District personnel can put a "pronoun flag" in students' Infinite Campus profile. A "pronoun flag" is designed to alert school personnel that the student wants to be referred to by new pronouns different from those associated with their natal sex. Unlike a change in the student's pronouns in Infinite Campus unaccompanied by a "pronoun flag," the "pronoun flag" signifies that the new pronouns are not to be revealed to the students' parents. The "pronoun flag" was designed by the District to allow school personnel to be alerted about students' wishes regarding their pronouns while keeping that information secret from parents. *See* 2024 LGBTQ+ Toolkit at 8 (noting that the "pronoun flag" is not visible on the "parent portal" and may be used by students who "are not 'out' to their parents/guardians").

93.     In this litigation, the District has submitted evidence tending to show that (1) during A.D.'s 8th grade year, she asked her 8th grade counselor to put a "pronoun flag" on

18

FIRST AMENDED VERIFIED COMPLAINT

her Infinite Campus account noting that she wanted to go by non-female pronouns and (2) A.D.'s 8th grade counselor put a "pronoun flag" on her Infinite Campus account. While A.D. does not have a specific recollection either of making such a request of her 8th grade counselor or of her 8th grade counselor informing her that he was putting a "pronoun flag" on her Infinite Campus account, at this time, A.D. does not dispute the District's evidence on this point.

94.    At all relevant times, the 8th grade counselor was an employee of the District, was acting within the course and scope of employment within the District, and was acting pursuant to the Parental Exclusion Policy.

95.    A.D.'s 8th grade counselor did not tell the Does about the "pronoun flag" or that A.D. was going by non-female pronouns, nor did anyone else at the District.

96.    A.D. did not seek to go by a boy's name at her middle school.

97.    During the 2022–23 school year, A.D. was a freshman at a high school (9th through 12th grades) in the District.

98.    Early in the school year, A.D. began seeing a school counselor (the "Counselor") on a regular basis.

99.    At all relevant times, the Counselor was an employee of the District and was acting within the course and scope of employment with the District.

100.    A.D. informed the Counselor that she was experiencing feelings of depression, anxiety, and transgender identification.

101.    To help alleviate A.D.'s psychological distress, the Counselor encouraged A.D. to undergo social transitioning at school.

FIRST AMENDED VERIFIED COMPLAINT

102.    The Counselor offered to help A.D. with the transition, including by assisting A.D. to change her school records in Infinite Campus to reflect the transition.

103.    A.D. told the Counselor that she wanted to be socially transitioned and that she did not want her parents to know because she did not think they would approve.

104.    A.D. did not tell the Counselor that her parents would abuse or otherwise harm her if they found out she was experiencing a transgender identity or was undergoing a social transition at school, nor did she give the Counselor any reason to think her parents would react that way.

105.    Because changing A.D.'s name and pronouns in Infinite Campus would allow her parents to learn of the change, A.D. asked the Counselor not to make this change. Instead, A.D.'s teachers could see the "pronoun flag" that was placed on her account, and A.D. separately informed her teachers and school administrators that she wanted to go by a non-female name that she had picked out—"Z.D."—in all her classes and throughout the school environment.[3]

106.    Pursuant to the Parental Exclusion Policy, A.D.'s teachers, administrators, classmates, and counselors—including the Counselor—thus began referring to her by "Z.D." They also referred to her by non-female pronouns.

107.    The Counselor did not inform the Does about A.D.'s name change, nor did anyone else at the District.

---

[3] Regardless of who placed the "pronoun flag" on A.D.'s Infinite Campus account—the Counselor or A.D.'s 8th grade counselor—and regardless of precisely when it was first placed there—the early part of her 9th grade year or during her 8th grade year—it was in effect no later than the early part of her 9th grade year.

FIRST AMENDED VERIFIED COMPLAINT

108. During one of A.D.'s first meetings with the Counselor in the fall semester of her freshman year, the Counselor suggested that A.D. use Colorado's I Matter program to obtain free mental-health therapy.

109. The I Matter program is a web portal maintained by the Colorado Behavioral Health Administration that allows children to receive a set number of psychotherapy sessions from private licensed mental health professionals that are paid for by the state. *See generally* Colo. Rev. Stat. Ann. § 20-60-109; *see also* I Matter Homepage, attached hereto as Exhibit M and available online at https://imattercolorado.org (last visited Oct. 22, 2024). Under Colorado law, children twelve years old and older may consent to receive mental health treatment without parental consent or notice on certain terms set forth by statute. *See* Colo. Rev. Stat. Ann. § 12-245-203.5.

110. The Counselor offered for A.D. to use the Counselor's computer to access the I Matter program so A.D.'s parents would not learn about her social transition.

111. A.D. used the Counselor's computer to connect with a licensed clinical social worker (the "Therapist") through the I Matter program. The Therapist was transgender.

112. Over the next several months, A.D. had virtual therapy sessions with the Therapist on a regular basis.

113. The Counselor allowed A.D. to use the Counselor's office and computer for the I Matter therapy sessions with the Therapist so A.D.'s parents would not find out about her social transition.

114. During the therapy sessions, the Therapist referred to A.D. as "Z.D." and by non-female pronouns. When A.D. questioned whether she really had a transgender

21

FIRST AMENDED VERIFIED COMPLAINT

identity, the Therapist would tell her, "You are a boy." The Therapist also discussed taking testosterone and having a mastectomy as the next steps in A.D.'s transition.

115.    Under Colorado law, minors may not take testosterone or have a mastectomy without parental consent.

116.    A.D. discussed her therapy sessions with the Counselor.

117.    Several months into the fall semester, the Counselor contacted the Does by telephone to inform them of the Counselor's concern that A.D. was showing signs of social withdrawal, depression, and anxiety and that her mental health was deteriorating.

118.    In that telephone call, the Counselor did not mention that A.D. had transitioned to a male gender identity or was having regular psychotherapy sessions with the Therapist.

119.    To conceal A.D.'s social transition from the Does, the Counselor referred to A.D. as "A.D." and used female pronouns during that conversation despite the fact she was referring to A.D. as "Z.D." and by non-female pronouns at school.

120.    In the spring semester of A.D.'s freshman year, she exhausted her free I Matter therapy sessions.

121.    A.D. asked her parents to pay for her to continue using the I Matter program.

122.    The Does initially agreed to pay for A.D. to continue using the I Matter program. At that time, the Does did not know that the Therapist was encouraging A.D. to undergo a medical transition.

123.    In March 2023, during the spring semester of A.D.'s freshman year, the Does learned that A.D. was experiencing a transgender identity. At that time, they did not know that A.D. had been socially transitioned at school.

FIRST AMENDED VERIFIED COMPLAINT

124.   A.D. told the Counselor that her parents had learned she was experiencing a transgender identity.

125.   The Counselor called Mrs. Doe to discuss the situation.

126.   On the call, the Counselor asked if Mrs. Doe was going to harm A.D. because she was experiencing a transgender identity. Mrs. Doe responded, "Of course not!" The Counselor did not press the issue further.

127.   The Counselor asked Mrs. Doe if she wanted A.D. to be socially transitioned at school.  Mrs. Doe responded that she did not.

128.   On that call, the Counselor did not inform Mrs. Doe that A.D. had already been socially transitioned at school since the beginning of her freshman year.

129.   Instead, continuing to conceal A.D.'s social transition from the Does, the Counselor referred to A.D. as "A.D." and used female pronouns despite the fact she was referring to A.D. as "Z.D." and by non-female pronouns at school.

130.   Shortly after Mrs. Doe's call with the Counselor, the Does learned that the Therapist was encouraging A.D. to undergo a medical transition. They stopped paying for A.D.'s I Matter therapy sessions.

131.   Shortly after Mrs. Doe's call with the Counselor, the Does began to suspect that A.D. was being socially transitioned at school.

132.   The Does were opposed to A.D.'s social transition, and they informed the Counselor of their objection. However, they were concerned that if they strenuously voiced their objection to the District, the Counselor or other District personnel would contact the Colorado Department of Human Services and arrange for A.D. to be taken

23

FIRST AMENDED VERIFIED COMPLAINT

from them. While the Does did not want A.D.'s school to continue to socially transition her, they were powerless to stop it.

133.    The Does sought to provide their daughter with adequate mental health resources to help her cope with her mental health struggles, including arranging for her to see a private counselor during that time, but her mental health deteriorated during the remainder of her freshman year and into her sophomore year.

134.    The Does' relationship with A.D. had worsened since her social transition began at the beginning of her freshman year, and, in the spring semester of her freshman year and into her sophomore year, it worsened further because she wanted to start testosterone and have a mastectomy, but the Does would not consent to her undergoing these procedures. Instead, they wanted her to explore non-transitioning treatment options prior to making irreversible decisions.

135.    In March of 2024, during the spring semester of A.D.'s sophomore year, A.D. informed her parents that she no longer identified as a boy and wished to return to living life as a girl.

136.    In May of 2024, A.D. asked another school counselor (not the Counselor) to remove the "pronoun flag" in her Infinite Campus account. The counselor complied and began referring to A.D. with female pronouns. A.D. did not ask her teachers to stop calling her "Z.D." or to stop referring to her with non-female pronouns, nor did she alert them to the removal of the "pronoun flag."

137.    Through the end of A.D.'s sophomore year—that is, after the effective date of the Name Change Law (April 29, 2024)—her teachers continued referring to her as "Z.D." and with non-female pronouns.

24

FIRST AMENDED VERIFIED COMPLAINT

138. In August of 2024, at the beginning of A.D.'s junior year, her new teachers started calling her "A.D." and referring to her with female pronouns, presumably because that is what her Infinite Campus profile said. A.D. did not ask her new teachers to refer to her by "Z.D." or with non-female pronouns.

139. At the beginning of A.D.'s junior year, she had several current teachers/advisors who had also been her teachers/advisors during her freshman and sophomore years. These teachers/advisors initially referred to A.D. as "Z.D." and with non-female pronouns, as they had done in her freshman and sophomore years. A.D. informed these teachers/advisors that she now goes by "A.D." and uses female pronouns.

140. When A.D. told these teachers/advisors that she now goes by "A.D." and uses female pronouns, some of them were skeptical and suggested she was doing something wrong by de-transitioning. They asked her questions like "Are you sure?" and "Is this your parents?"

141. When A.D. has encountered her prior teachers/advisors from her freshman and sophomore year who are not her current teachers advisors, some of them have referred to her as "Z.D." and with non-female pronouns. A.D. has not told all her prior teachers/advisors from her freshman and sophomore years that she now goes by "A.D." and uses female pronouns. A.D. intends to do so if and when she feels the time is right.

142. A.D. regrets wanting to transition and now believes that her underlying mental health struggles and uncertainty regarding her sexual orientation prompted her to adopt a transgender identity. A.D. believes that her transgender identity was perpetuated in part by being affirmed through her social transitioning.

FIRST AMENDED VERIFIED COMPLAINT

143.    A.D. is thankful that her parents did not allow her to undergo irreversible medical procedures.

144.    While A.D. currently feels like a girl, she is still struggling with her gender identity, and there is a part of her that does not yet feel comfortable in a female body. She is trying to understand those feelings and get back to her prior self, but she has not yet figured out how to do that. A.D. believes living as a boy at school for two years has made that process more difficult for her.

### THE DOES' HARM

145.    As set forth below, the Does have been harmed by the District's previous social transition of A.D. under the Name Change Law and Parental Exclusion Policy, are likely to be harmed in the future by the Name Change Law and Parental Exclusion Policy, and are currently being harmed by the Name Change Law and Parental Exclusion Policy.

146.    The District's previous social transition of A.D. violated the Does' constitutional rights, and the Does' relationship with A.D. was adversely affected by the District's actions.

147.    The Does are likely to be harmed in the future by the Name Change Law and Parental Exclusion Policy because they are subject to a realistic danger that their daughters will be socially transitioned without their consent or knowledge pursuant to the Parental Exclusion Policy.

148.    Despite the fact A.D. currently identifies as a girl, it is too soon to say that her transgender identity has desisted.

FIRST AMENDED VERIFIED COMPLAINT

149.    A.D. has not fully de-transitioned at school. Thus, certain District personnel know her as "Z.D." and use non-female pronouns to refer to her. A.D. plans to inform these individuals of her de-transition if and when the time feels right for her.

150.    In youth, coming to have a permanent gender identity can be a process, and A.D. only recently began identifying as a girl again after having transgender feelings for approximately five years. Over those five years, A.D. has gone through other periods—like this one—where she has not felt a transgender identification and the transgender identification returned.

151.    A.D. is still suffering from the underlying psychological conditions that likely triggered her transgender identification in the first place, a fact that makes the reappearance of her transgender identity more likely.

152.    A.D. inhabited a male identity at school for two school years, a fact that makes it likely that her transgender identity will persist because of the psychological effect that inhabiting a transgender identity has on persistence.

153.    Like other children, A.D. is susceptible to peer and other outside pressures, and the pressure against fully de-transitioning—and in favor of re-transitioning to a boy again—at A.D.'s school are high.

154.    A.D.'s peer group includes many children who identify as LGBTQ+. A.D. will face peer pressure not to fully de-transition and to re-transition to a boy again.

155.    District personnel at A.D.'s school are highly supportive of students with a LGBTQ+ identification—including by posting flags that celebrate LGBTQ+ identities, wearing clothing that celebrate LGBTQ+ identities, and convening clubs that celebrate LGBTQ+ identities—while they are neutral toward students without a LGBTQ+

27

FIRST AMENDED VERIFIED COMPLAINT

identification. A.D. will face pressure—whether intended or not—from District personnel not to fully de-transition and to re-transition to a boy again.

156.    Considering the turmoil the Does' family has experienced over the past two years due to the District's social transition of A.D., it is likely that, if she decides not to fully de-transition at school—or if she decides to re-transition to a boy—she will not tell her parents or authorize the District to tell her parents.

157.    B.D. attends middle school in the District.

158.    While B.D. currently identifies as a girl, like other children, B.D. is susceptible to peer and other outside pressures, and the pressure to socially transition at B.D.'s school are high.

159.    At B.D.'s school, it is fashionable to identify as LGBTQ+. B.D. will face peer pressure to socially transition at school.

160.    At B.D.'s school, District personnel encourage students to evaluate whether they feel like they might be LGBTQ+ and, if so, to speak with school counselors. In addition, District personnel are highly supportive of students with a LGBTQ+ identification—including by posting flags that celebrate LGBTQ+ identities, wearing clothing that celebrate LGBTQ+ identities, and convening clubs that celebrate LGBTQ+ identities—while they are neutral toward students without a LGBTQ+ identification. B.D. will face pressure—whether intended or not—from District personnel to transition to a boy.

161.    In the Does' judgment, B.D. is too immature to process whether she has a transgender identity.

FIRST AMENDED VERIFIED COMPLAINT

162.    The environment to which B.D. is exposed at her middle school makes it likely that she will come to have a transgender identity and seek to be socially transitioned at school, like her sister did.

163.    Considering the turmoil the Does' family has experienced over the past two years due to the District's social transition of A.D., it is likely that, if B.D. decides to seek to be socially transitioned at school, she will not tell her parents or authorize the District to tell her parents.

164.    The Does are currently suffering harm caused by the Name Change Law and the Parental Exclusion Policy

165.    The Does are unable to obtain truthful information from the District that is necessary for them to decide how best to raise their daughters. Specifically, if the Does ask District personnel whether their children are being socially transitioned at school, District personnel would be required not to say "yes"—regardless of whether their children are being socially transitioned at that time—so long as the Does' children did not authorize notice and the District determined that disclosure was not appropriate. The Does intend to seek such information on a regular basis beginning in the 2024–25 school year and continuing throughout the time their daughters attend school in the District.

166.    The Name Change Law and Parental Exclusion Policy offer A.D. and B.D. a means by which to be socially transitioned at school without parental consent and notice.

167.    The Name Change Law and Parental Exclusion Policy sow seeds of doubt in A.D. and B.D.'s minds as to whether the Does are fit parents who are looking out for their best interests.

29

FIRST AMENDED VERIFIED COMPLAINT

168.     The Name Change Law and Parental Exclusion Policy require the Does to alter their relationships with their children.

169.     Because of the Name Change Law and Parental Exclusion Policy, the Does must speak with their children about gender-identity related issues that they otherwise would not discuss with them to attempt to deter them from seeking to be socially transitioned at school in secret and/or to ascertain whether they are being socially transitioned at school in secret.

170.     Because of the Name Change Law and Parental Exclusion Policy, the Does must self-censor their speech with their children about gender-identity related issues to attempt to deter them from seeking to be socially transitioned at school in secret and/or to ascertain whether their children are being socially transitioned at school in secret.

171.     Because of the Name Change Law and Parental Exclusion Policy, the Does must  monitor their children's activities at school more closely than they otherwise would to attempt to ascertain whether their children are being socially transitioned at school in secret.

### CAUSES OF ACTION

**COUNT ONE**
**42 U.S.C. § 1983—Substantive Due Process**
**(Against all Defendants for declaratory and injunctive relief/against the District for damages)**

172.     The Does hereby incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

173.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects the fundamental rights of parents to direct and control the upbringing of their children; to make decisions concerning the care, custody, and control of their

30

FIRST AMENDED VERIFIED COMPLAINT

children; to consent and notice when the government seeks to provide healthcare treatment to their children; to consent and notice when the government seeks to make important decisions in the lives of their children; and to make private familial decisions without unwarranted intrusion by the state.

174.    These fundamental rights are deeply rooted in our nation's history and tradition and implicit in the concept of ordered liberty.

175.    On their face and as applied to the Does, the Name Change Law and Parental Exclusion Policy violate these rights in at least the following ways:

    a.  The Name Change Law and Parental Exclusion Policy impermissibly authorize children and/or the District to make mature, consequential, private, and potentially life-altering decisions that go to heart of parental decision-making without obtaining parental consent or providing parental notice;

    b.  The Name Change Law and Parental Exclusion Policy impermissibly inject the District into the family bonds that tie parents to their children without obtaining parental consent or providing parental notice;

    c.  The Name Change Law and Parental Exclusion Policy impermissibly presume that parents are not fit and/or will not act in the best interests of their children, presumptions that (1) violate the constitutionally mandated presumptions of parental fitness and affection and (2) sow seeds of doubt in children's mind about whether their parents are acting in their best interests;

31

FIRST AMENDED VERIFIED COMPLAINT

d.  The Name Change Law and Parental Exclusion Policy impermissibly usurp parents' responsibility as the ultimate decision-maker vis-à-vis their children regarding their children's mental health, well-being, and private family matters and assigns that responsibility to the child and/or the District;

e.  The Name Change Law and Parental Exclusion Policy impermissibly allow the District to conceal important information from parents about their children's healthcare treatment, mental health and well-being, and private family matters, thus precluding parents from taking actions that they would deem in their children's best interests if they were provided with the relevant information;

f.  The Name Change Law and Parental Exclusion Policy impermissibly authorize the District to engage in healthcare treatment of children, in the form of socially transitioning them to a new gender, without obtaining parental consent or providing parental notice;

g.  The Name Change Law and Parental Exclusion Policy are harmful to children because they remove parents from the decision-making process regarding social transitioning and leave this decision to children themselves despite the fact children are rash, immature, and susceptible to outside pressures;

h.  The Name Change Law and Parental Exclusion Policy are harmful to children because they cause persistence of transgender identities that would otherwise naturally desist;

32

FIRST AMENDED VERIFIED COMPLAINT

i.  The Name Change Law and Parental Exclusion Policy are harmful to children by creating a situation where a child inhabits different gender identities and roles at home and school over parental objection or without parental knowledge is inherently psychologically unhealthy for the child and damaging to the parent-child relationship;

j.  The Name Change Law and Parental Exclusion Policy impermissibly result in the District providing substandard psychological treatment of children because parental involvement—and parents' deep knowledge of their children over their life course, family interactions, and extra-circular environment—is necessary for the diagnosis, assessment, and treatment of children;

k.  The Name Change Law and Parental Exclusion Policy impermissibly result in the District providing substandard psychological treatment of children because they presume that immediate and unqualified affirmation is the only permissible response to a child exhibiting gender confusion;

l.  The Name Change Law and Parental Exclusion Policy impermissibly preclude parents from obtaining truthful information from the District regarding important matters in their children's lives even upon request; and

m.  The Name Change Law and Parental Exclusion Policy impermissibly result in the District providing unconsented-to psychological treatment because children are cognitively incapable of giving informed consent to life-altering healthcare interventions like social transitioning and the more-drastic gender-affirming care that is likely to follow, and even if children could

33

FIRST AMENDED VERIFIED COMPLAINT

consent, District personnel are not required to explain the risks associated with social transitioning to children before it is undertaken.

176.    On their face and as applied to the Does, the Name Change Law and Parental Exclusion Policy are not narrowly tailored to any compelling governmental purpose; do not further any important or legitimate government purpose; are not supported by any rational basis; constitute an unwarranted interference with family relationships; and are the product of deliberate indifference to the rights of parents and their children.

177.    Students have no right of privacy vis-à-vis their parents with respect to either their gender identity or the fact that their school is socially transitioning them.

178.    Students have no reasonable expectation of privacy vis-à-vis their parents with respect to their gender identity or the fact that their school is socially transitioning them.

179.    Parents' right to notice and consent trumps any countervailing right students might have.

180.    The Name Change Law and Parental Exclusion Policy are directed at the parent-child relationship with knowledge that schools' conduct will adversely affect that relationship.

181.    Obtaining parental consent—and providing parental notice—before socially transitioning their children is feasible. Indeed, the District already requires parental consent for a host of school-based activities, like field trips, the distribution of medication, and organized sports. *See* Field Trips and Excursions/IHOA-R1, attached as Exhibit N;

34

FIRST AMENDED VERIFIED COMPLAINT

Administering Medication to Students/JLCD, attached Exhibit O; Constitution of the Colorado High School Activities Association § 1780, attached as Exhibit P.

182. The District violated the Does' parental rights by socially transitioning A.D. pursuant to the Parental Exclusion Policy without obtaining their consent or providing them notice.

183. The District's actions were directed at the parent-child relationship with knowledge that the conduct would adversely affect that relationship.

184. The District's actions shock the conscience.

185. The District had time to make unhurried judgments and had the chance for repeated reflection both in adopting the Parental Exclusion Policy and in socially transitioning A.D.

186. The Does are entitled to (1) monetary relief against the District based on the past violations of their rights and (2) declaratory and injunctive relief invalidating and restraining Defendants from the ongoing violations of their rights as set forth herein.

187. The Does have no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined as set forth herein.

**COUNT TWO**
**42 U.S.C. § 1983—Procedural Due Process**
**(Against all Defendants for declaratory and injunctive relief/against the District for damages)**

188. The Does hereby incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

35

FIRST AMENDED VERIFIED COMPLAINT

189.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects individuals' liberty interests against governmental infringement without due process of law.

190.    On their face and as applied to the Does, the Name Change Law and Parental Exclusion Policy infringe upon protected liberty interests without providing adequate procedural safeguards, including a thorough investigation into the relevant facts, notice, and an opportunity to be heard by a neutral decisionmaker.

191.    The Does have a liberty interest in directing and controlling the upbringing of their children; making decisions concerning the care, custody, and control of their children; consenting and receiving notice when the government seeks to provide healthcare treatment to their children; consenting and receiving notice when the government seeks to make important decisions in the lives of their children; and making private familial decisions without unwarranted intrusion by the state

192.    On their face and as applied to the Does, the Name Change Law and Parental Exclusion Policy fail to provide adequate procedural safeguards—in the form of a thorough investigation into the relevant facts, notice, and an opportunity to be heard by a neutral decisionmaker—when the District adjudicates whether: (1) the child's chosen name "reflect[s his or her] gender identity," Colo. Rev. Stat. Ann. § 22-1-145(a)(2); Name Changes Policy: ACA; (2) whether use of the chosen name is presenting "difficulty" for the child, 2024 LGBTQ+ Toolkit at 6; (3) whether "the health, well-being, and safety" of the child in counsels in favor of parental notification of their child's social transition, 2024 LGBTQ+ Toolkit at 7; and (4) whether the parents are "supportive" of the transition. District Opp'n to Pls.' Mot. for Prelim. Injunc. at 6 n.3, 24.

FIRST AMENDED VERIFIED COMPLAINT

193.    The District violated the Does' procedural due process rights by socially transitioning A.D. without providing them a thorough investigation into the relevant facts, notice, and an opportunity to be heard by a neutral decisionmaker.

194.    The Does are entitled to (1) monetary relief against the District based on the past violations of their rights and (2) declaratory and injunctive relief invalidating and restraining Defendants from the ongoing violations of their rights as set forth herein.

195.    The Does have no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined as set forth herein.

## COUNT THREE
### 42 U.S.C. § 1983—First Amendment
### (Against all Defendants for declaratory and injunctive relief/against the District for damages)

196.    The Does hereby incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

197.    The First Amendment to the United States Constitution protects the fundamental right of individuals to enter into and maintain certain intimate human relationships, including family relationships, without undue interference by the state.

198.    This right includes the right of parents to form personal bonds with their children with which the state may not interfere. Parents' relationships with their children have played a critical role in the culture and traditions of our Nation through the cultivation and transmittal of shared ideals and beliefs, thereby fostering diversity and acting as a buffer between the individual and the power of the state.

199.    By authorizing the District to socially transition children without obtaining parental consent or providing parental notice, the Name Change Law and Parental

37

FIRST AMENDED VERIFIED COMPLAINT

Exclusion Policy are directed at the parent-child relationship with knowledge that schools'
conduct will adversely affect that relationship and they directly and substantially interfere
with that relationship.

200.    The District violated the Does' First Amendment rights by socially
transitioning A.D. without obtaining their consent or providing them notice.

201.    The District's actions were directed at the parent-child relationship with
knowledge that the conduct would adversely affect that relationship and they directly and
substantially interfered with that relationship.

202.    The Does are entitled to (1) monetary relief against the District based on
the past violations of their rights and (2) declaratory and injunctive relief invalidating and
restraining Defendants from the ongoing violations of their rights as set forth herein

203.    The Does have no adequate remedy at law for these deprivations and will
suffer serious and irreparable harm to their constitutional rights unless Defendants are
enjoined as set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, the Does request the following relief:

1.    A declaration that the Name Change Law and Parental Exclusion Policy
are facially invalid and invalid as applied to the Does under the substantive and
procedural components of the Due Process Clause and the First Amendment;

2.    A preliminary and permanent injunction preventing Defendants and all
those acting in concert with them from implementing, enforcing, or abiding by the Name
Change Law and Parental Exclusion Policy during the pendency of this litigation and at
all times in the future;

FIRST AMENDED VERIFIED COMPLAINT

3.       Nominal damages against the District;

4.       Costs and attorney's fees pursuant to 42 U.S.C. § 1988;

5.       A trial by jury on all claims for which the Does have such a right; and

6.       Such further relief that the Court deems just and proper.

Respectfully submitted,

Dated: October 22, 2024.

by:

*/s/Josh W. Dixon*
Harmeet K. Dhillon*
Josh W. Dixon
Eric A. Sell
Center for American Liberty
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6212
harmeet@libertycenter.org
jdixon@libertycenter.org
esell@libertycenter.org

Scott Gessler
Gessler Blue Law
7350 E. Progress Place
Suite 100
Greenwood Village, CO 80111
(720) 839-6637
sgessler@gesslerblue.com

*Attorneys for Plaintiffs*
*John and Jane Doe*
*Application for Admission Forthcoming

39

FIRST AMENDED VERIFIED COMPLAINT

## VERIFICATION

I, Jane Doe, declare as follows:

1.      I am over the age of eighteen years old, I am competent to make this verification, and have personal knowledge of the matters set forth herein.

2.      I have reviewed the First Amended Verified Complaint in this matter.

3.      The allegations in paragraphs 4–8, 12–17, and 84–171 of the First Amended Verified Complaint are within my personal knowledge and are true and correct to the best of my knowledge.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed on October 22, 2024

_Jane Doe_
JANE DOE

## VERIFICATION

I, John Doe, declare as follows:

1.     I am over the age of eighteen years old, I am competent to make this verification, and have personal knowledge of the matters set forth herein.

2.     I have reviewed the First Amended Verified Complaint in this matter.

3.     The allegations in paragraphs 4–8, 12–17, and 84–171 of the First Amended Verified Complaint are within my personal knowledge and are true and correct to the best of my knowledge.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed on October 22, 2024

_____
JOHN DOE

## VERIFICATION

I, A.D., declare as follows:

1.      I am a minor child. I am of sound mind and have personal knowledge of the matters set forth herein.

2.      I have reviewed the First Amended Verified Complaint in this matter.

3.      The allegations in paragraphs 4–8 and 84–156 of the First Amended Verified Complaint are within my personal knowledge and are true and correct to the best of my knowledge.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed on October 22, 2024

_A.D._
A.D.