**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:24-cv-2185-CNS-SBP

JOHN AND JANE DOE,

     Plaintiffs,

v.

PHILIP WEISER, in his official capacity as Attorney General of the State of Colorado;
SUSANA CÓRDOVA, in her official capacity as Commissioner of the Colorado
Department of Education; and
SCHOOL DISTRICT 27J a/k/a 27J SCHOOLS, in its official and personal capacities,

     Defendants.

---

## ORDER

---

     Before the Court is Plaintiffs' motion for a preliminary injunction. ECF No. 2. Defendants School District 27J (the District), Susana Córdova (the Commissioner), and Philip Weiser (the Attorney General) all oppose Plaintiffs' request for a preliminary injunction. ECF Nos. 25, 27, 29.[1] Plaintiffs and Defendants Córdova and Weiser also requested that the Court rule on the motion for preliminary injunction without a hearing. For the reasons below, the Court DENIES the motion for preliminary injunction.[2]

---

[1] Plaintiffs recently filed a notice of supplemental authority, ECF No. 78, but the Court has determined that such authority is relevant to the merits of the case rather than the preliminary injunction. The Court will address it in its forthcoming order on the motions to dismiss.
[2] This Order renders Defendant Córdova's motion for discovery, ECF No. 37, moot.

## I.   BACKGROUND

In this lawsuit, Plaintiffs request a declaration that House Bill 24-1039, codified at Colo. Rev. Stat. §§ 22-1-145, *et seq.* (the Law), and the District's related policies,[3] are both facially invalid and invalid as applied to Plaintiffs. ECF No. 52 at 38 (First Amended Complaint). They also seek a permanent injunction preventing Defendants from implementing or enforcing the Law and Policies. *Id.* In the present motion, Plaintiffs seek to preliminarily enjoin Defendants from enforcing the Law and Policies as applied to their two children, A.D. and B.D., and from "socially transitioning" A.D. and B.D. without Plaintiffs' written consent. ECF No. 2 at 1–2.

### A.   HB24-1039 and the District's Antidiscrimination Policies

Colorado statutes impose nondiscrimination duties on school districts. *See* Colo. Rev. Stat. § 22-32-109(1)(ll)(I)(A). Since 2008, Colorado's nondiscrimination laws have included sexual orientation, which was defined to include transgender status. 2008 Colo. Sess. Laws, ch. 341. In 2021, the legislature updated the legal framework to distinguish sexual orientation from gender identity and gender expression. Colo. Rev. Stat. §§ 24-34-301(9), (10), (24). Colorado requires school districts to adopt policies to address discrimination and harassment, which must include procedures for accepting complaints, investigating complaints, and providing support. Colo. Rev. Stat. §§ 22-1-143(1)–(2). The policies must be public, clear, and communicated frequently to parents and students.

---

[3] Plaintiffs refer to the District policies collectively as the "Parental Exclusion Policy" or the Policy, and state that it includes the LGBTQ+ Toolkit, the Bullying Prevention and Education Policy: JICDE (forbidding "[g]ender identity harassment"), and Policy ACA. ECF No. 52, ¶ 73. Calling the District's antidiscrimination policies the "Parental Exclusion Policy" is inherently misleading and presupposes that the policies exclude parental involvement. As will be discussed in depth below, the policies actually *encourage* parental involvement. Thus, the Court will refer to the policies, when referring to them collectively, as the Policies.

Colo. Rev. Stat. § 22-1-143(3). Related investigations must be confidential. C.R.S. §§ 22-1-143(2a), (7).

House Bill 24-1039, effective April 2024, requires public school employees to address students by their chosen name reflecting that student's gender identity, and provides that knowingly failing to do so is discriminatory.[4] C.R.S. § 22-1-145 *et seq.* The student's wishes, therefore, control. *Id.* For many school districts, this change merely codified their existing antidiscrimination policies and practices. *See* ECF No. 27 at 5. HB 24-1039 does not mention parental consent or exclusion and gives districts substantial discretion over implementation. *Id.*; C.R.S. § 22-1-145(5).

The rights of parents are codified in other statutes. Relevant here, parents receive notice of a district's policies every year, C.R.S. § 22-1-143(3)(c); they have a right to access student records upon request, C.R.S. § 22-1-145(5); and they have a right to request medical accommodations, C.R.S. § 22-1-143(6)(a).

The District has policies that govern the process for supporting transgender, non-binary, and gender non-conforming students. ECF No. 52, ¶¶ 71–83. Generally, the policies prohibit discrimination and bullying on the basis of sex, sexual orientation, gender identity, gender expression, and other categories. *See* Policy AC, ECF No. 25-1; Policy JICDE, ECF No. 25-2. The LGBTQ+ Toolkit (the Toolkit) contains the District's policies, procedures, and resources for supporting LGBTQ+ students. ECF No. 52, ¶¶ 71–72; ECF

---

[4] C.R.S. § 22-1-145(1)(a) states:
> (2) A public school employee, educator, and contractor . . . shall address a student by the student's chosen name and use the student's chosen name in school and during extracurricular activities.
> (3) Unless done at a student's request, knowingly or intentionally using a name other than the student's chosen name or the knowing or intentional avoidance or refusal to use a student's chosen name is discriminatory.

No. 52-J (the Toolkit). It has been in place since February 2021, undergoing minor revisions after the passage of HB24-1039 in April 2024. *Id.*

The Toolkit directs staff to affirm a student's choice if they initiate a discussion about changing their name or pronouns and discuss how best to support that choice. ECF No. 52-J at 4–5. Students can change their name, pronouns, and gender in their school records, which, students are advised, are visible to anyone with access to the records, including parents, guardians, and staff. *Id.* at 6–7, 8. Alternatively, students can note their preferred name or pronouns in a "flag" in their online file that only District staff can view. *Id.* at 7–8. The Toolkit notes that, because the pronoun flag is not visible to parents, it may be used by students who "are not 'out' to their parents/guardians." ECF No. 52-J at 8.

The Toolkit directs counselors to work with the student to decide whether, and to what extent, the parents or guardians will be involved, and counselors "must consider the health, well-being and safety of the student in transition." *Id.* at 6. Where possible, the Toolkit encourages parental involvement: "the goal should be to support the student's family in accepting their child's gender identity and seek opportunities to foster a better relationship between the student and their family." *Id.* at 12–13. Counselors are also advised to "ask whether the student's family is accepting in order to avoid inadvertently putting the student at risk of greater harm by discussing [the issue] with the student's family." *Id.* at 12. The Toolkit also states that "school staff shall not disclose any information that may reveal a student's transgender status to others, including parents or guardians and other school staff, unless legally required to do so or unless the student has authorized such disclosure," which includes using "the student's legal name and the

pronoun corresponding to the student's gender assigned at birth unless the student, parent, or guardian has specified otherwise." *Id.* at 14. The Toolkit further emphasizes the importance of transgender students feeling "safe enough to be themselves" and having "a safe place to learn." *Id.* at 12.

### B.  The Does' Children: A.D. and B.D.

A.D. and B.D. attend school in School District 27J in Brighton, Colorado. ECF No. 52, ¶¶ 84, 157.[5] A.D. is currently a junior in high school, and B.D. is in middle school. *Id.*, ¶¶ 138, 157. A.D. currently uses her birth name and "she/her" pronouns.[6]

In eighth grade, A.D. told her counselor that she was questioning her gender identity as female, that she preferred "they/them/their" pronouns, and that her parents did not support her questioning of her gender identity. ECF No. 25-E (Decl. Middle School Counselor), ¶ 3. The counselor, with AD's permission, put a "flag" in her online file noting that A.D. preferred "they/them/their" pronouns, which was only visible to District staff. *Id.*, ¶ 4. The counselor told A.D.'s teachers about the preferred pronouns. *Id.*, ¶ 5. The counselor did not coach A.D. or encourage questioning of her gender identity or use of "they/them/their" pronouns. *Id.*, ¶ 6. The counselor did not tell A.D.'s parents about the flag because A.D. had told the counselor that her parents did not support her questioning her gender identity. *Id.*, ¶ 7–8. Importantly, Plaintiffs never asked the counselor about this. *Id*. A.D. never told the counselor that she identified as a transgender male or that she wanted to be referred to by another name than A.D. *Id.*, ¶ 10.

---

[5] The facts in this section are taken from the amended complaint, ECF No. 52, and from declarations attached to the District's response to the preliminary injunction request, ECF No. 25.

[6] In the briefing, Plaintiffs refer to A.D. with she/her pronouns and indicate that she currently uses these pronouns. The Court will therefore refer to A.D. using she/her pronouns.

After beginning high school in August 2022, A.D. met with her assigned school counselor. The counselor greeted A.D. using her birth name, but A.D. responded, "My name is Z.D." ECF No. 25-F (Decl. High School Counselor 1), ¶ 3. The counselor noticed the pronoun flag and concluded that A.D. was questioning or transitioning her gender identity. *Id.*, ¶ 3. The counselor and A.D. did not discuss her potential transgender status at the meeting, nor did the counselor coach or encourage A.D. to question or transition her gender identity. *Id.* In a later meeting, A.D. told the counselor that she was struggling with mental health, in part because her parents did not support her being transgender. *Id.*, ¶ 5. The counselor referred A.D. to IMatter, a state-funded program that provides up to six free, virtual, and confidential therapy sessions to Colorado youth. *Id.*

In March 2023, A.D. told the counselor that her mom had emailed her expressing anger with A.D. for being transgender, using a different name at school, and accessing therapy through IMatter. *Id.*, ¶ 9. A.D. told the counselor that she was afraid to go home and that her parents "don't understand me; they want me to be a girl, but I don't feel like a girl. In my head and in my body, I feel like a boy." *Id.*, ¶ 9.

The counselor, with A.D.'s permission, called A.D.'s mom to talk about the issue. *Id.*, ¶ 9. In the conversation, the counselor told Ms. Doe that A.D. was extremely upset over the email and was afraid to go home. *Id.*, ¶ 10. Ms. Doe responded, "I would never harm my child; I'm just worried about her." *Id.* The counselor told Ms. Doe that A.D. was very stressed that her parents did not accept her being transgender; Ms. Doe responded, "I'm a feminist, and [A.D.] is not honoring her femininity." *Id.* The counselor concluded that, while A.D.'s parents did not support her being transgender, A.D. did not appear to

be in danger of abuse or neglect. *Id.* A.D. confirmed the next day that she was physically safe, but that her parents "just don't understand who I am." *Id.*, ¶ 11.

In May 2023, A.D. and the counselor created a gender support plan so that when A.D. had a new counselor her sophomore year, the new counselor would know A.D.'s chosen name and pronouns. ECF No. 25-F, ¶ 12; ECF No. 25-G (GSP). The gender support plan stated that A.D.'s parents were aware that she was transgender but were not supportive and that staff should refer to A.D. using her birth name and she/her pronouns when speaking with her parents. ECF No. 25-G at 2. A.D. never authorized the counselor to share the plan, and thus, the counselor did not share it with anyone. ECF No. 25-F, ¶ 12.

In March 2024, the spring of A.D.'s sophomore year, A.D. told her parents that she "no longer identified as a boy and wished to return to living life as a girl." ECF No. 52, ¶ 135. In May 2024, she asked another school counselor to remove the pronoun flag from her online file. *Id.*, ¶ 136. A.D. did not ask her teachers to stop calling her Z.D. or using "they/them/their" pronouns, and her teachers continued to refer to her that way. *Id.*, ¶¶ 136–37.

C.R.S. § 22-1-145 went into effect on April 29, 2024. In July 2024, consistent with C.R.S. § 22-1-145, the District adopted Policy ACA, which "outlines the process by which students may change the name they are referred to at school to align with their gender identity." ECF No. 25-J (Policy ACA). The policy states that students may choose to be identified in school by the first name that they have designated and may request a change to their name or gender on their official student record. *Id.* Students do not need parental approval to use a chosen name, but parents "may be notified of their student's name

change if appropriate." *Id.* The Toolkit was then updated to reflect Policy ACA. ECF No. 25-C at 6–7.

Now in A.D.'s junior year, which started in August 2024, her new teachers call her A.D. and use "she/her" pronouns. *Id.*, ¶¶ 138–39. A.D. has informed some of her former teachers that she goes by A.D., including the art teacher. *Id.*; ECF No. 25-L (Art Teacher Decl.), ¶ 4. She also told the art teacher, "Nothing to worry about, that's just my choice." *Id.* A.D. also corrected the art teacher after the teacher used "they/them/their" pronouns, noting that she preferred "she/her" pronouns. *Id.*, ¶ 5. A.D. intends to tell more of her prior teachers and advisers when she feels the time is right. ECF No. 52, ¶ 141.

A.D.'s sibling, B.D., has not indicated any desire to use pronouns other than "she/her" or to use a name other than B.D. Plaintiffs allege that the District is introducing her to the concept of transgender identities and that there are pressures for her to "socially transition," which "makes it likely" that she will seek to use different pronouns at school. ECF No. 2 at 25.

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). To prevail on a preliminary injunction motion, movants bear the burden of showing that: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs the injury the injunction would cause the opposing party; and (4) the injunction would not adversely affect the public interest. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citation omitted). "An injunction can issue only if

each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). "To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Irreparable harm is more than merely serious or substantial harm. *Id.* "[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.*

The purpose of injunctive relief is to prevent future violations of the law, and thus a plaintiff must demonstrate "a good chance of being likewise injured in the future." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991). An evidentiary hearing in response to a motion for preliminary injunction is not required, and courts have discretion to determine whether to hold such a hearing. *See Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014).

### III. ANALYSIS

No party requested a preliminary injunction hearing. Because there is very little factual dispute, the Court finds that a hearing would not assist in the resolution of the motion. The Court further finds that Plaintiffs cannot establish all four factors necessary for a preliminary injunction, particularly likelihood of success on the merits, and thus declines to issue a preliminary injunction.

#### A. Likelihood of Success on the Merits

To warrant a preliminary injunction, Plaintiffs must first show that they are likely to succeed on the merits. Plaintiffs assert that the Law and Policies violate their substantive due process rights, procedural due process rights, and First Amendment rights. Plaintiffs

argue that the Law and Policies are unlikely to survive constitutional scrutiny, so it is likely that they will win a merits trial. Defendant Weiser argues that Plaintiffs are unlikely to succeed on the merits because he is entitled to sovereign immunity, and the remaining Defendants argue that Plaintiffs are unlikely to succeed on the merits because they lack standing and the request suffers from other deficiencies. The Court addresses these arguments in turn, ultimately agreeing with Defendants on both points.

### 1. Attorney General Immunity

Defendant Weiser, Colorado's Attorney General, argues that Eleventh Amendment sovereign immunity shields him from suit. The Court agrees.

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009)). The bar extends to suits against officials in their official capacities. *Hendrickson v. AFSCME Council 18,* 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

An exception to the bar exists for suits against state officials "seeking to enjoin alleged ongoing violations of federal law," but the official "must have some connection with the enforcement of the act." *Peterson*, 707 F.3d at 1206 (quoting *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011)); *Ex parte Young*, 209 U.S. 123, (1908). For the exception to apply, the state official must have "a particular duty to enforce" the statute and "a demonstrated willingness to exercise that duty." *Peterson*, 707 F.3d at 1205. Such a duty cannot just be a "mere general duty to enforce the law"; it must arise from the challenged law, another law, an administrative delegation, or a

demonstrated practice of enforcing a provision. *Hendrickson*, 992 F.3d at 965; *Peterson*, 707 F.3d at 1207.

The Attorney General argues that HB24-1039 does not impose any enforcement duty on him. Instead, the Law delegates enforcement to the public schools: it allows students to file a report or complaint with their public school or local education provider that governs their public school. C.R.S. § 22-1-145(4). Absent a particular duty to enforce in the statute, the exception does not apply.

Plaintiffs disagree, arguing that the Attorney General has the general enforcement power to enforce Colorado's laws and that this duty is sufficient to avoid Eleventh Amendment immunity. Plaintiffs cite to Colo. Rev. Stat. § 24-31-113, which grants the Attorney General the authority to bring an enforcement action against "any governmental authority" for violating state law. However, this is just a general duty to enforce laws, which is not enough to avoid Eleventh Amendment immunity. An official's "general enforcement power . . . does not suffice for *Ex parte Young*." *Hendrickson*, 992 F.3d at 967. Thus, the Attorney General does not have a particular duty to enforce HB24-1039.

Nor does the complaint establish that the Attorney General has demonstrated a willingness to exercise an enforcement duty in this arena. There are no allegations that the Attorney General has taken action to enforce HB24-1039 against the District, or any other school district. Plaintiffs instead refer to an amicus brief that the Attorney General filed in the Ninth Circuit in support of a similar law in California. ECF No. 34-6 at 1. The brief referenced Colorado's "compelling interest in providing public schools where all students are included and can thrive." *Id.* Based on this asserted interest, Plaintiffs argue, the Attorney General is likely to bring an enforcement action against a school district that

violated HB24-1039. *Id.* However, this statement only demonstrates the Attorney General's stated commitment to antidiscrimination; that alone is insufficient to demonstrate a willingness to enforce the law.[7]

Because Plaintiffs have not established that the Attorney General has a particular duty to enforce HB24-1039, or that he has demonstrated a willingness to exercise that duty, he appears to be entitled to Eleventh Amendment sovereign immunity. Plaintiffs are thus unlikely to succeed on the merits against the Attorney General.

### 2. Standing

The other Defendants argue that Plaintiffs lack standing and so cannot succeed on the merits. At the preliminary injunction stage, "a plaintiff must make a 'clear showing' that they have standing and are 'entitled to such relief.'" *Nat'l. Ass'n for Gun Rights v. Polis*, No. 24-cv-00001-GPG-STV, 2024 WL 3085865 at *5 (D. Colo. May 2, 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) ("At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that [they] [are] 'likely' to establish each element of standing."). The Court agrees that Plaintiffs have failed to make a clear showing that they suffered an injury-in-fact sufficient to establish standing at the preliminary injunction stage, and so they are unlikely to succeed on the merits.

To establish Article III standing, plaintiffs must first have suffered an "injury in fact" to a legally protected interest. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, plaintiffs must establish that the injury is fairly traceable to the challenged action.

---

[7] *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1223–24 (S.D. Cal. 2023), in contrast, held that the California Attorney General was a proper party because the Attorney General had previously taken enforcement action against two school districts.

*Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotations and citations omitted). Here, the issue is whether Plaintiffs have established an injury-in-fact.

### a. Injury-In-Fact

To constitute an injury in fact, a plaintiff must show that they have suffered or likely will suffer an "invasion of a legally protected interest" that is both (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Rocky Mountain Gun Owners*, 121 F.4th at 109 (quoting *Lujan*, 504 U.S. at 560). For an injury to be "concrete," it "must be 'de facto,' it must 'exist,' and it must be 'real' rather than 'abstract.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). It need not be tangible. *Id.* To be "particularized," the injury must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

An injury-in-fact may be "imminent," meaning that a plaintiff "need not wait for the harm to occur" or expose themselves "to actual arrest or prosecution to be entitled to challenge a statute" that they claim "deters the exercise" of their constitutional rights. *Rocky Mountain Gun Owners*, 121 F.4th at 109; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013). However, "'allegations of *possible* future injury' are not sufficient." *Clapper*, 569 U.S. at 409 (quoting *Whitmore*, 495 U.S. at 158). The threatened injury "must be certainly impending and not merely speculative." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (internal quotations omitted).

Pre-enforcement challenges to laws that have yet to be applied to the plaintiff typically occur as challenges to: (1) an existing law under which the plaintiff has previously been prosecuted; (2) an existing law where the plaintiff has yet to be prosecuted; or (3) an enacted law before it takes effect. *Rocky Mountain Gun Owners*, 121 F.4th at 110. To bring a pre-enforcement challenge, the plaintiff must show: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" the challenged statute; and (2) that "there exists a credible threat of prosecution thereunder." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159). The first requirement involves presenting "concrete plans to engage in the conduct" that would potentially violate the challenged statute once it goes into effect. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016). "Speculative plans or vague intentions to *potentially* violate the challenged statute are insufficient." *Rocky Mountain Gun Owners*, 121 F.4th at 110 (quoting *Lujan*, 504 U.S. at 564). Plaintiffs must show "a credible and imminent threat of enforcement." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 873 (10th Cir. 2020).

For the most part, Plaintiffs are bringing a pre-enforcement challenge. A.D. stopped using "they/them" pronouns and the name Z.D. in March 2024, and the Law went into effect afterwards, on April 29, 2024, meaning that Plaintiffs are challenging a law that has not yet been applied to their children. As to the Policies, the only policy that was in place and applied to A.D. was the Toolkit; the other policies were not in place until after she returned to using "she/her" pronouns and the name A.D. A preliminary injunction is only appropriate to prevent future harm, so any prior application of the Toolkit cannot be

addressed by a preliminary injunction.[8] The focus is on any ongoing injury and risk of future harm caused by the Law and Policies.

Plaintiffs argue that, even though the Law has not yet been applied to them, they have suffered both actual injury in the form of ongoing harm and imminent injury due to a risk of future harm.

*i.  Actual Injury: Ongoing Harm*

Defendants argue that Plaintiffs are not suffering an actual injury because the Law and Policies are not being applied to their children. Plaintiffs argue that they are suffering three ongoing injuries, even if their children never seek to change their name at school: Plaintiffs' inability to obtain accurate information about whether their children are "social transitioning"; the creation of a decisional framework that authorizes children to make decisions without their parents; and the fact that Plaintiffs have changed their behavior in response to the Law and Policies. ECF No. 34 at 9.

The Court is not convinced that Plaintiffs have made a clear showing of ongoing harm. While Plaintiffs point to a case concluding that a parent who requests information about what name and pronouns their child uses at school, and is denied or lied to, may have suffered an injury-in-fact, no such thing occurred here. *See Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees,* 680 F. Supp. 3d 1250, 1277 (D. Wyo. 2023). Moreover, absent such a denial happening, the possibility of that denial does not constitute ongoing harm. *See Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*, 657 F. Supp 3d 1161, 1170–71 (W.D. Wis. 2023), *aff'd*, 95 F.4th 501 (7th Cir. 2024), *cert. denied*, 2024 WL 5036271 (Dec. 9, 2024) (finding that plaintiffs did not have

---

[8] Moreover, the lack of irreparable harm, as discussed below, also weighs against a preliminary injunction with respect to the Toolkit.

standing partly because "plaintiff does not allege . . . that any parent or guardian [in the plaintiff organization] has been denied information related to their child's identity").[9]

The second and third theories of ongoing harm are similarly unlikely to succeed. Plaintiffs argue that they have a fundamental right to be involved in their children's decision-making process; however, they have not met their burden of showing that the Law or Policies infringe on this right. Despite the claim that "the District is socially transitioning their children," the District is not the decision maker at issue: the student is. The Law and Policies only require the District to follow the student's chosen name and pronouns and to provide support. There is no indication that the Law or Policies provide the District with any decision-making power, and there is no indication that it shifts decision-making power from parents. The power to make decisions regarding a student's preferred name and pronouns has always resided with the student.

Plaintiffs' third theory of ongoing harm is that they are injured by having to change their behavior because of the Law and Policies by requiring them to speak to their children about gender-related issues, self-censor their speech with B.D. to avoid implying that they would not approve of a social transition, and monitor their children's activities at school more closely. ECF No. 34 at 18. The Court is not convinced that Plaintiffs are "required to engage in these behavioral modifications" to counter the impacts on their relationships with their children, or that such modifications constitute harm. The only caselaw Plaintiffs cite to support this theory is a dissent and a case in which the Supreme Court found that it was reasonable to expect that illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway. *Friends of the Earth,*

---

[9] Because this case appeared to be directly on point, the Court delayed issuing this Order pending a decision on the petition for certiorari.

*Inc. v. Laidlaw Env't. Servs., Inc.*, 528 U.S. 167, 184 (2000). In contrast, here, there is no reasonable causal connection between these alleged behavioral shifts and the Law and Policies. It is also unclear how the alleged behavioral shifts are harmful, whereas losing recreational access to a waterway clearly is.

These theories of ongoing harm essentially boil down to fears that the Law and Policies might be applied in the future, which is not enough to confer standing. *See Parents Protecting Our Children, UA*, 657 F. Supp 3d. at 1170–71 ("Although plaintiff argues that defendants' Guidance denies its members the information they need to exercise their constitutional decision-making authority regarding their children, the actual application of the Guidance to *their* children remains fatally speculative."). These allegations do not support an inference that any actual harm is presently occurring.

*ii.  Imminent Injury: Future Harm*

Plaintiffs also argue that they face a "realistic danger" of future harm: that A.D. will seek to re-transition, or that B.D. will seek to transition, in the relatively near future and that the Law and Policies will be enforced to allow them to use different names and pronouns at school without Plaintiffs' consent or knowledge. *Id.* at 9–10. Plaintiffs argue that there is "a realistic danger that [A.D.] will come to identify as a boy again and seek to be socially transitioned," and that the same is true of B.D. because "the District is introducing the concept of transgender identities to her at too young of an age to comprehend, there are peer and other outside pressures at the District to socially transition, and the environment to which B.D. is exposed at her middle school makes it likely that she will come to have a transgender identity and seek to be socially transitioned at school." ECF No. 2 at 24.

The Court agrees with Defendants that Plaintiffs have only established a speculative possibility of injury. It is possible that A.D. will change her mind and again choose to use "they/them/their" pronouns and the name Z.D., but this is merely speculation that does not rise to "certainly impending." Plaintiffs do not currently have "concrete plans" or "an intention to engage in a course of conduct" that the Law or Policies would proscribe, because A.D. does not currently have the intention of using non-female pronouns or the name Z.D. again.

As Defendants point out, Plaintiffs allege that A.D. currently identifies as a girl, "regrets wanting to transition and now believes that her underlying mental health struggles prompted her to adopt a transgender identity," and "is thankful that her parents did not allow her to undergo irreversible medical procedures." ECF No. 52, ¶¶ 142–43. Defendants argue that these allegations, particularly that she regrets wanting to transition, indicate that it is improbable that A.D. chooses to use "they/them/their" pronouns or the name Z.D. again. The possibility that A.D. might (1) identify as non-female in the future, (2) ask the District to use a different chosen name or pronouns, and (3) ask the District to not include her parents in the process, is too attenuated and speculative to show a credible and imminent threat of enforcement. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) ("[W]e have repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient.").

Plaintiffs also argue that A.D. faces social pressure against de-transitioning, which makes it more likely that she will choose to identify as a boy. Again, the possibility that A.D. may change her mind due to alleged pressures is not sufficient to classify A.D.'s

potential future choice to use "they/their/them" pronouns or another name at school as "certainly impending." And, as the District points out, the law only applies to students choosing to use a different name to reflect their gender identity; it would not apply to a student choosing to use a different name to conform to peer pressure. ECF No. 27 at 10.

The Court is also not convinced that Plaintiffs have established injury through the possibility that B.D. might choose to socially transition at school. There is no indication that B.D. has ever expressed any transgender or gender nonconforming identification. Alleged but unidentified social and environmental pressures to transition are not sufficient to make B.D.'s potential future transition into anything other than speculation.

In sum, the possibility of Plaintiffs' future injury is too attenuated and too speculative. Other federal courts have held the same regarding similar policies. *Parents Protecting Our Children*, 657 F. Supp. 3d at 1161; *Parents Defending Education v. Linn-Mar Cmty. Sch. Dist.*, 629 F. Supp. 3d 891 (N.D. Iowa 2022) (vacated as moot following legislation passage) (finding no standing because the "theory that (1) their child will express a desire for or indicate by mistake a desire for a plan, (2) the child will be given a plan, (3) without parental consent or knowledge, (4) and the information will be hidden or denied when parents ask requires too many speculative assumptions without sufficient factual allegations to support a finding of injury"). As in *Clapper*, the chain of causation is also weakened by its reliance on third parties' discretionary acts: the student's choice to express a desire for new pronouns and name without their parents' involvement.

Because Plaintiffs have not made a clear showing that they have standing at this stage, they are unlikely to succeed on the merits. The first preliminary injunction factor

weighs in favor of Defendants, which could end the analysis. However, the other factors also favor Defendants.

### B.  Irreparable Injury

The second preliminary injunction factor is whether the movants will suffer irreparable injury without an injunction. Infringement of a constitutional right is typically enough, and most courts require no further showing. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). However, as discussed above, Plaintiffs have not made a clear showing of a constitutional injury sufficient to establish standing. Similarly, following the same analysis, Plaintiffs have not shown that they will suffer an irreparable injury without an injunction, because it is unlikely that they can establish that their constitutional rights are being, or will be, infringed.

Additionally, the delay in the challenge to the Toolkit[10] weakens Plaintiffs' argument of irreparable injury. The Toolkit went into effect in February 2021; this challenge was brought three years later, in 2024. The Tenth Circuit has held that "delay in seeking [injunctive] relief cuts against finding irreparable injury." *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (cleaned up). Three years of delay in seeking emergency relief undermines Plaintiffs' argument that emergency relief is necessary. *See Slusser v. Mountain W. Conf.*, No. 1:24-CV-03155-SKC-MDB, 2024 WL 4876221, at *7 (D. Colo. Nov. 25, 2024) (denying injunctive relief and finding delay in bringing suit—two years after enactment and months after it was first enforced—was not reasonable); *GTE Corp. v. Williams*, 731 F.2d 676, 679 (denying preliminary injunction and noting "movant's delay in bringing suit

---

[10] Arguably the real focus of Plaintiffs' claims, as it is the policy that most directly addresses parental support.

is an important factor in determining irreparable harm."). Similarly here, Plaintiffs' three-year delay in challenging the Toolkit undermines their claim of impending irreparable injury. The second factor also favors Defendants.

### C. Balance of Harms

The balance of harms factor also favors denying the injunction. Absent an injunction, Plaintiffs face a speculative possibility of future harm. However, as the requested injunction would only enjoin Defendants from enforcing the Law and Policies as applied to Plaintiffs' children, granting an injunction for that limited purpose would not result in much harm to the District, as long as it does not impact other students. However, it is possible that a limited injunction could discourage the District from applying the Law and Policies to other students. This would be a tangible harm because it would impede the District's ability to support LGBTQ+ students and create a learning environment free from discrimination. The balance of harms factor is largely neutral because it would only apply to Plaintiffs' children, but it slightly favors Defendants.

### D. Public Interest

It is in the public interest to protect Plaintiffs' constitutional rights. However, it is unlikely that Plaintiffs will be able to show that their constitutional rights have been infringed, as discussed above. The public also has an interest in establishing learning environments free from discrimination, and Defendants have made a clear showing that the Law and Policies facilitate that interest. This factor favors Defendants.

## IV.  CONCLUSION

Because Plaintiffs have not met their burden of showing that each preliminary injunction factor is met, the Court DENIES their motion for a preliminary injunction, ECF No. 2.

DATED this 24th day of January 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge